UNITED STATES of America

v.

Nicodemo SCARFO, et al.

Crim. A. No. 88–00003–1–19.

United States District Court,
E.D. Pennsylvania.

April 20, 1989.

1318

phia Strike Force, Philadelphia, Pa., for plaintiff.

Robert F. Simone, Philadelphia, Pa., for Nicodemo Scarfo.

Oscar B. Goodman, Las Vegas, Nev., for Philip Leonetti.

Edwin J. Jacobs, Jr., Atlantic City, N.J., for Salvatore Merlino.

Nicholas J. Nastasi, Philadelphia, Pa., for Joseph Ciancaglini.

Robert E. Madden, Philadelphia, Pa., for Francis Iannarella, Jr.

Edward Reif, Philadelphia, Pa., for Lawrence Merlino.

Louis Theodore Savino, Jr., Philadelphia, Pa., for Charles Iannece.

Hope C. Lefeber, Philadelphia, Pa., for Salvatore Wayne Grande.

Steve LaCheen, Philadelphia, Pa., for Joseph Pungitore.

Donald C. Marino, Philadelphia, Pa., for Phillip Narducci.

Joseph C. Santaguida, Philadelphia, Pa., for Frank Narducci, Jr.

Christopher G. Furlong, Broomall, Pa., for Salvatore Scafidi.

Michael W. Pinsky, Westmont, N.J., for Ralph Staino.

Willis Berry, Jr., Philadelphia, Pa., for Joseph Grande.

Stephen P. Patrizio, Philadelphia, Pa., for Nicholas Virgilio.

Joseph P. Capone, Marlton, N.J., for Anthony Pungitore, Jr.

Albert J. Wicks, Louis R. Pichini, Asst. Attys. in Charge; David E. Fritchey, Arnold Gordon, Joseph Peters, Organized Crime and Racketeering Section, Philadel-

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

In the instant matter, a jury convicted defendant Nicodemo Scarfo and sixteen of his associates of various crimes. The indictment under which defendants were found guilty includes seven counts. Counts I and II respectively charge RICO conspiracy and substantive violations, 18 U.S.C. § 1962(c), (d). They identify Scarfo and sixteen other defendants as members of an enterprise known as La Cosa Nostra, the LCN, the Mafia, the mob, this thing of

ours, the Bruno family and the Scarfo family. The indictment alleges that a succession of bosses ran the enterprise, and that Nicodemo Scarfo was its most recent boss. The underboss, most recently Salvatore Merlino and then Philip Leonetti, worked directly below the boss. The enterprise also had an advisor, known as a "consig", and leaders of regimes known as "capos". Soldiers, the most inferior members of the Mafia hierarchy, comprised the regimes.

The purpose of the enterprise was to "control, manage, finance, supervise, participate in, and set policy concerning the making of money through illegal means." In counts I and II, the indictment charges that the enterprise conducted its affairs through a pattern of racketeering activity which included thirty-nine acts of murder, attempted murder, conspiracy to commit murder, extortion, collection of credit by extortion, illegal lotteries (also charged in count III), illegal sports bookmaking (also charged in count IV), conspiracy to distribute and distribution of controlled substances (also charged in counts V, VI, and VII). Counts I and II also charge five collections of unlawful debt. The Mafia carried out these activities primarily in the Philadelphia and Southern New Jersey areas.

Two of Scarfo's associates, Thomas Del-Giorno and Nicholas Caramandi, pleaded guilty and testified as government witnesses. They chose to participate with the government because their lives allegedly had been threatened. In light of the circumstances of this case, all parties agreed to an anonymous jury. In addition, the Court granted the government's motion to sequester the jury.

The trial commenced on September 28, 1988 and concluded on November 17, 1988. After deliberating for a few days, the jury convicted all the defendants on all counts.[1] As a result of those convictions, the defendants filed several posttrial motions. The Court provided defendants with generous extensions of time in which to brief their motions. On March 23, 1989, the Court held oral argument on the motions. We will now address the merits of the motions.

*Evidentiary Rulings*

Defendant Charles Iannece argues that the Court erred in denying his motion to suppress the fruits of the search and seizure effected in Lake Harmony, Pennsylvania on October 29, 1987. Iannece argues that the introduction of evidence of his flight without additional limiting instructions prejudiced him and entitles him to a new trial. He suggests that the flight evidence was admissible only as to one predicate act, the Rouse Hobbs Act Extortion, and that the Court should have instructed the jury to consider that evidence only with regard to that act. Iannece also argues that under Fed.R.Evid. 404(b)[2] and 403[3], the Court should not have admitted evidence of the guns seized from Iannece because Agent Warner told the jury that one of the guns was stolen; thus, defendant argues, the jury could have concluded that Iannece was responsible for stealing the gun.

According to the testimony of FBI Special Agent Warner, on October 29, 1987 Agent Warner arrested Iannece in Lake Harmony Pennsylvania. (Tr. 11/8/88 at 33). Pursuant to an executed consent to search form, Agent Warner searched the residence and recovered the following: four sets of identification in the name of

---

1. The jury did not find an attempt to murder in racketeering act nine of count one. The jury found all other racketeering acts and collections of debt proven beyond a reasonable doubt.

2. F.R.E. 404(b) provides as follows:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity or absence of mistake or accident.

3. Fed.R.Evid. 403 provides as follows:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Donald Casalaro, including a driver's license with Iannece's picture on it; a birth certificate and Social Security card in the name of Thomas Joseph Pecca; two handguns, one of which was reported stolen in Washington, D.C. in 1977; and numerous rounds of hollow point ammunition. (Tr. 11/8/88 at 33–38).

Near the conclusion of Agent Warner's testimony, Stephen LaCheen, attorney for Joseph Pungitore, Jr., argued at sidebar that the possession of the guns were 404(b) material, irrelevant to the issue of flight and prejudicial. (Tr. 11/8/88 at 40–41). After a short colloquy on the issue, the Court concluded that admission of the evidence concerning the guns was not prejudicial and was relevant. (Tr. 11/8/88 at 43). No defense attorney argued that the Court should exclude evidence concerning the stolen gun because the jury would conclude that Iannece was responsible for stealing the gun. On behalf of Iannece, Mr. Savino argued only that the Court should not admit the flight and related evidence because Iannece was incarcerated at the time of the instant RICO indictment and the evidence was unrelated to any charges in the indictment. We find that the Court properly admitted the evidence.

 Flight is viewed in the law of evidence as admission by conduct which expresses consciousness of guilt. E. Cleary, *McCormick on the Law of Evidence* § 271 at 655 (2d ed. 1972); *See also United States v. Miles*, 468 F.2d 482, 489 (3d Cir.1972) (flight admissible as circumstantial evidence of guilt to be considered with other facts of the case). Its probative value depends upon whether there is sufficient evidence to establish the following four inferences: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to the actual guilt of the crime charged. *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). Defendant argues that the last two elements have not been shown because Iannece was incarcerated a the time of the RICO indictment. For flight evidence to be admissible, however, it is not necessary that an actual indictment trigger flight; knowledge of the cooperation of a codefendant, *see United States v. Tille*, 729 F.2d 615, 622 (9th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984), or reason to believe that one is sought for commission of crimes, *see United States v. Eggleton*, 799 F.2d 378, 381 (8th Cir.1986), is also sufficient to trigger flight. In the instant matter, the evidence suggested that Iannece became a fugitive before he was indicted on any charges, and after learning that Nicholas Caramandi began cooperating with officials. (Tr. 10/29/88 at 126). The potential damage Caramandi's cooperation could create was not limited to the Rouse extortion, but extended to many of the predicate acts included in the instant RICO indictment. Thus, because Iannece's knowledge of the Caramandi cooperation could have triggered his flight, the court properly admitted the flight evidence. Furthermore, defendants never requested a more specific limiting instruction and did not object[4] to the Court's instruction on flight.[5]

---

4. Throughout this opinion we refer to defendants' failures to timely object. Fed.R.Evid. 103 provides that error may not be predicated upon an erroneous ruling which admits or excludes evidence unless a substantial right of the party is affected and the attorney makes a timely and explicit objection. Rule 103 also provides, however, that we should take notice of plain errors affecting substantial rights although they were not brought to the attention of the court. Wherever we refer to a defendant's failure to object, Rule 103 governs our review.

5. The Court instructed the jury that flight may be considered only with regard to the individual defendant against whom it is offered in light of all the evidence in determining guilt or innocence. The Court also instructed the jury that the significance to be attached to any flight is a matter exclusively within their province, and that they should consider whether there are other reasons for the flight other than consciousness of guilt. (Tr. 11/17/88 at 17–18). This instruction was sufficiently balanced to allow the jury to consider the issue fairly. *See United States v. Castro*, 813 F.2d 571, 578 (2d Cir.), *cert. denied*, ─ U.S. ─, 108 S.Ct. 137, 98

■ Iannece also argues that under Fed. R.Evid. 404(b), the Court should not have admitted evidence of the guns and ammunition. With regard to the stolen gun, Iannece argues that the jury could have prejudiced Iannece by concluding that he was involved in the theft. Iannece suggests that the Court should have performed a balancing test under Rule 403 and concluded that the probative value was outweighed by the danger of unfair prejudice.

■ Defendant's argument is not only speculative, but even if the jury would have concluded that Iannece was involved in the theft, this "other crime" pales in the face of substantial evidence concerning defendant's involvement with several murders and shakedowns. After hearing the argument of Mr. LaCheen, and in finding that the gun evidence was relevant to flight and admissible, the Court implicitly balanced the prejudice with the relevance and found the probative value outweighed the potential prejudice. Mr. LaCheen argued that admitting this evidence was "like putting ink in milk," to which the Court responded, "I don't think we have that type of situation here. . . . I think it's relevant that he has guns with him. I think it's part of the flight." (Tr. 11/8/88 at 42–43). Especially given the general nature of the objection,[6] it was not necessary that the Court more explicitly perform the Rule 403 balancing test. *See United States v. Lebovitz,* 669 F.2d 894, 901 (3d Cir.) (when trial court fails to articulate balancing test, in some instances we find that court implicitly made the requisite balancing) (citing *United States v. Provenzano,* 620 F.2d 985, 1003 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980)), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed. 2d 446 (1982); *United States v. Long,* 574 F.2d 761, 766 (3d Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978) (the dynamics of a trial do not always permit a detailed Rule 403 analysis). Furthermore, where the defendant does not

specifically invoke Rule 403, the balancing is subsumed in the Court's ruling. *Id.* Under the circumstances, the Court did all the Rules required it to do. Therefore, defendant's motion is denied.

### Alleged Perjured Testimony

Defendants move to strike the testimony of government witnesses Thomas DelGiorno, Nicholas Caramandi, and Michael Madgin on the ground that their testimony was perjurious and based upon contingent plea agreements. The Court finds this argument meritless.

■ The Supreme Court has held that a defendant is denied due process if the government knowingly introduces perjured testimony to obtain a conviction. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The government need not solicit false evidence; it is sufficient if the government allows the evidence to go uncorrected when it surfaces. *Id.* at 269–70, 79 S.Ct. at 1177. The burden of establishing the perjury is on the defendants. *United States v. Griley,* 814 F.2d 967, 971 (4th Cir.1987). The defendants must show more than mere inconsistencies in testimony by government witnesses; the defendants must meet the heavy burden of showing that the testimony was knowingly false. *Id.*

■ Defendants argue that the government witnesses lied about their governmental remuneration and that witnesses' arrangements with the government were contingent upon the conviction of the defendants. We find otherwise. The plea agreements admitted into evidence specifically state that the rights of the witness were not dependent upon or affected by the outcome of any case in which they testify. (*See* G. 117a, G. 118, G. 119). The trial testimony supported this understanding. For example, Gerald Egan, the attorney who negotiated the plea agreement on DelGiorno's behalf, testified that "the Federal

---

L.Ed.2d 94 (1987); *United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

6. Defendants did not comply with Fed.R.Evid. 103(a) in stating that "even if the material objected to had probative value, it was 'substantially outweighed by the danger of unfair prejudice.'" *Long,* 574 F.2d at 766.

Government made it clear that money was not contingent upon—was not result oriented. That he had to cooperate and testify truthfully." (Tr. 11/10/88 at 235). We find no evidence of perjury or contingent fee arrangements. Therefore, defendants motion is denied.

### Error in Conduct of Trial

Defendants argue that throughout the trial the Court showed "partisanship" toward the government attorneys and "disdain" toward defense counsel. Specifically, defendants assert that upon defense objections the Court repeatedly made hostile facial expressions and responded in an antagonistic tone of voice. Defendants argue that this conduct had a chilling effect on defense counsel and deprived defendants of a fair trial. The Court finds these sweeping arguments frivolous and entirely without merit.[7]

7. Throughout the trial, the Court treated the defense fairly. However unnecessary this exercise may appear, for the record, we will list examples of the numerous occasions on which the Court extended itself for the defense:

1. Over the strenuous objection of the government, the Court granted defendants additional peremptory challenges.

2. Although it is not required by the Federal Rules, the Court allowed the lawyers to conduct their own voir dire after Mr. Simone explained that he considered jury selection one of the most important parts of his case.

3. As discussed in more detail *infra*, the Court allowed Mr. Simone more leeway in conducting his cross examination than Chief Judge Fullam did in *United States v. Scarfo*, No. 86-004534-04, hearing at 9-13 (E.D.Pa. April 14, 1987). We restricted only his injecting his own credibility into the examination.

4. The Court granted several defense requests for additional time, late starts, and many Saturdays off.

5. With waivers from their clients, the Court permitted defense counsel to absent themselves when necessary from the proceedings.

6. After defense counsel had difficulty getting transcripts from state court proceedings, the Court personally arranged for their expeditious procurement.

7. The Court affirmed all defendants' points for charge and upon defense objection refused to include the government's "missing witness" charge.

8. The Court forced the government to finish its closing late into the night so that the defense could begin first thing in the morning. (Tr. 11/16/88 at 146).

### Double Jeopardy

Under F.R.Crim.P. 34[8], defendants argue that racketeering acts three (Falcone Murder) and twelve (Testa Murder) of this indictment fail to charge an "act or threat involving murder ... chargeable under state law" because all defendants charged with the murders of Vincent Falcone and Salvatore Testa were acquitted in state court. Defendants argue that where a jury acquits a defendant of substantive charges, the identical charges can not constitute a predicate act "chargeable under state law." 18 U.S.C. 1961(1). Thus, defendants argue that RICO does not permit inclusion of the Testa and Falcone murders, and that such inclusion places them in double jeopardy. The Court disagrees.

■ The double jeopardy clause of the Fifth Amendment provides that no person

9. The Court did not exercise its contempt powers when Mr. Berry gave an improper closing which grossly misstated the government's burden of proof: Mr. Berry demonstrated the burden of proof by displaying before the jury a pair of scales on which he balanced some coins on one side and a brick on the other. In *United States v. Clay*, 476 F.2d 1211, 1215 (9th Cir. 1973), the court held that in explaining the burden of proof to a jury in a criminal case, one must "eliminate all references to ... 'balancing of evidence.'" Mr. Berry also argued to the jury that they must give the defendants "the benefit of *any* doubt," and the government objected. The Court sustained the objection but did not provide a curative instruction until after Mr. Berry completed his closing. (Tr. 11/15/88 at 34-42). Likewise, the Court did not hold Attorney Pinsky in contempt when he appealed to the passions and prejudices of the jury in imploring the jury to "put fathers and husbands and wives back together, fathers with children, families together." (Tr. 11/15/88 at 66).

10. The Court revised the individual verdict sheets so that the words "not guilty" were always listed before the word "guilty", and appeared directly in front of the jury box and explained to the jury that "not guilty" was given greater prominence to remind them that the "defendants start off presumed innocent. The Government has the burden of proof." (Tr. 11/17/88 at 131).

8. In pertinent part, F.R.Crim.P. 34 provides that "[t]he court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged."

shall be "subject to the same offense to be twice put in jeopardy of life or limb." The Supreme Court has held that successive prosecutions by different sovereigns does not violate defendant's Fifth Amendment rights. *See Abbate v. United States,* 359 U.S. 187, 194, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959). An act denounced as a crime by the nation and a state is an offense against the peace and dignity of both and may be punished by both. *Id. See also Rinaldi v. United States,* 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). In *United States v. Frumento,* 563 F.2d 1083, 1088–89 (3d Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), the Third Circuit applied this principle to a federal racketeering case and concluded that the defendants were not placed in double jeopardy after a jury acquitted them in Philadelphia Municipal Court on extortion charges and later a jury found them guilty in federal court for violating RICO. The court expressly rejected the argument that an act must be "chargeable and punishable" under state law: RICO requires "only that the conduct on which the federal charges is based be typical of the serious crime dealt with by the state statute, not that the particular defendant be 'chargeable under State law' at the time of the federal indictment." *Id.* at 1087, n. 8. In the instant matter, defendants were charged with and found guilty of the federal crime of "racketeering," not the state offenses per se. The state offenses are merely definitional. *See Id.* at 1087. Thus, because the Falcone and Testa murders merely define part of the pattern of racketeering activity, defendants were not placed in double jeopardy. Defendants' motion is denied.

■ Defendant Joseph Ciancaglini also raises a double jeopardy argument. In his pretrial motions, because a jury previously convicted Ciancaglini of a RICO conspiracy involving the same enterprise, he moved to dismiss counts one and two of the indictment under the double jeopardy clause of the Fifth Amendment. This Court denied defendant's motion, and defendant appealed to the Third Circuit. In *United States v. Ciancaglini,* 858 F.2d 923 (3d Cir.1988),

the Third Circuit affirmed this Court's decision denying the defendant's motion. After conviction, Ciancaglini again raises his double jeopardy argument. We remain unpersuaded.

Defendant predicates both his pretrial and posttrial motions on a series of underlying facts: (1) both the 1981 indictment (Testa) and the 1988 indictment (Scarfo) involve Philadelphia-based crime families and both allege enterprises with the same goal; (2) the period of the conspiracy charged in Testa (June, 1972 until June, 1978) overlaps by approximately two years the conspiracy charged in Scarfo (April, 1976 to October, 1987); (3) one of the racketeering acts in the Scarfo indictment occurred within the period of the overlap; (4) five of the 123 overt acts charged in Scarfo occurred within the period of the overlap, two of which were alleged in the Testa indictment; (5) Ciancaglini is the only defendant named in both indictments.

Citing *United States v. Liotard,* 817 F.2d 1074 (3d Cir.1987), the Third Circuit applied a "totality of the circumstances test" to evaluate the merits of a conspiracy defendant's double jeopardy claim. *Ciancaglini,* 858 F.2d at 927. The court held that to give rise to a double jeopardy claim, a successive RICO charge must allege both the same enterprise and substantially the same pattern of racketeering activity. *Id.* at 928. Applying the totality of the circumstances test, and examining all the factors Ciancaglini cited in support of his contention, the court concluded that the two indictments charged distinct RICO violations: The pattern of racketeering activity

> "charged in the Testa indictment focus on illegal gambling and extortion. Those charged in the Scarfo indictment focus on murder and drug distribution. Although there is some overlap similarity and some time overlap in the two indictments, Ciancaglini's dual involvement is minimal. They allege different and distinct patterns of racketeering activity."

*Id.* at 930. Ciancaglini argues that we should find a double jeopardy violation not only for all the reasons that the Third Circuit rejected, but also because during

the trial the government radically changed its position on whether this case involves the same conspiracy as the Testa case. Specifically, defendant points to a statement made by the government during an argument concerning the admissability of a tape recording of the November 4, 1977 conversation between Scarfo and other LCN leaders. In arguing that the tape was relevant, the government noted that "this is an ongoing conspiracy." Defendant misreads this reference to conclude that the government concedes that the conspiracy alleged in the Testa indictment and the conspiracy alleged in the Scarfo indictment are the same "ongoing conspiracy." We find that the government clearly intended that phrase to refer to the ongoing nature of the conspiracy in Scarfo, not in Testa and Scarfo. The government did not radically change its position, but continued to prosecute two separate conspiracies. Therefore, we find that the government did not subject defendant twice to jeopardy. Defendant's motion is denied.

*Prosecutorial Misconduct*

Defendants argue that under F.R. Crim.P. 34 [9] the Court should arrest judgment on the grounds of prosecutorial misconduct. In support of this contention, defendants raise several arguments: (1) the prosecution illegitimately sought to corrupt the jury by conveying to them that defendants were dangerous criminals and that a conviction was necessary to the health and safety of the jurors; (2) the prosecution improperly attested to the bravery of witnesses and vouched for their honesty and integrity; (3) the prosecution made prejudicial closing remarks concerning individual defendants and concerning the evaluation of evidence; and (4) the prosecution improperly treated Mr. Simone and Mr. Santaguida. We find all of these arguments meritless.

■■■■ The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor; prosecu-

torial misconduct alone does not require a new trial. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The Third Circuit instructs us to inquire whether the prosecutor's remarks

"in the context of the entire trial, were sufficiently prejudicial to violate the defendant's due process rights" *United States v. Scarfo,* 685 F.2d 842, 848–49 (3d Cir.1982), *cert. denied,* 459 U.S. 1170 [103 S.Ct. 815, 74 L.Ed.2d 1014] (1983). "A conviction will be reversed only in those situations in which prejudice inures to the defendant from the challenged improprieties." *United States v. Somers,* 496 F.2d 723, 737 (3d Cir.), *cert. denied,* 419 U.S. 832 [95 S.Ct. 56, 57, 42 L.Ed.2d 58] (1974).

*United States v. Adams,* 759 F.2d 1099, 1111 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). *See also United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1194 (3d Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985).

We first note that with regard most of the prosecutorial misconduct arguments defendants raise, the defense has neither pointed to, nor can we find, any objection at trial to this alleged prosecutorial misconduct. Unless it would be plain error not to order a new trial based on prosecutorial misconduct, the failure to object at trial the government's remarks is fatal. *United States v. DiPasquale,* 740 F.2d 1282, 1296 (3d Cir.1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985). We will, however, for the sake of completeness, consider defendants' arguments to determine whether the Court committed either error or plain error.

■■■■ With regard to defendants' first contention, we find that the government did not improperly offer the testimony concerning witness relocations, living conditions, and admissions into the Witness Security Program to demonstrate witnesses' fear or to vouch for their credibility. Rather, the government properly offered the

---

**9.** In pertinent part, F.R.Crim.P. 34 provides as follows: "The court on motion of a defendant shall arrest judgment if the indictment or infor-

mation does not charge an offense or if the court was without jurisdiction of the offense charged."

testimony in reasonable anticipation of cross examination. *See United States v. Frankenberry,* 696 F.2d 239, 242–43 (3d Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1392 (1983) (testimony that a witness is in the Witness Security Program and has received substantial benefit may be elicited during direct examination to counter defense suggestions that his testimony is biased). Apart from the issue of witness relocation, the government offered testimony of witnesses' fear to help explain the reasons why the witnesses cooperated. This was also a fair and reasonable anticipation of cross examination. As the government argues, it was abundantly clear from defendants' opening arguments and from prior trials involving similar issues, that the defense would attack the witnesses' credibility based on money the government spent on their behalf. For example, in his opening statement, concerning the treatment of witnesses DelGiorno and Caramandi, Mr. Goodman told the jury that

> [w]hen they want liquor, the evidence is going to show they get liquor. When they want to get paid for their testimony, the evidence is going to show they get paid for their testimony.... And the evidence is going to show that they're not in some kind of a prison, but they're down by the beach having a better life than you folks are going to have for the next three months.... Now I submit to you that at the conclusion of all the testimony, you're going to be convinced that this type of pact with those type of people invites perversion of the truth.

(Tr. 9/29/88 at 40–42). Similarly, in his opening, Mr. Simone referred to the credibility of the witnesses in light of their custody: "they spent hundreds of thousands of dollars wining and dining these people ... and then you're going to judge their testimony which you will know to be untrue and incorrect." (Tr. 9/28/88 at 126–27).

Again, the defense does not cite to any objection on the record concerning the testimony of the witnesses in this area. Even had they objected, admission of this testimony would have been proper. In *United States v. Scarfo,* 850 F.2d 1015, 1018 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988), a Hobbs Act prosecution concerning the Rouse extortion (racketeering act thirty-nine in this case), the trial court permitted the prosecution to establish that (1) Caramandi and DelGiorno had committed certain crimes, including murders ordered by defendant Scarfo; (2) breaking the rules of La Cosa Nostra could result in a death sentence; and (3) Caramandi and DelGiorno believed their lives had been threatened. The Third Circuit held that this testimony was admissible for the reasons stated by the district court: to show Scarfo's leadership in the mafia, to show the grave consequences of conducting unapproved criminal activities, and to explain why DelGiorno and Caramandi began to cooperate despite the potential consequences they would suffer for betraying the Mafia. *Id.* at 1018. The court held that this testimony, while potentially damaging to the defendants, was "essential in the government's effort to establish the credibility of its disreputable, yet indispensable, witnesses." *Id.* at 1020. In the instant matter, the testimony was necessary to establish the witnesses' credibility, and was relevant in proving the existence of the RICO enterprise and some of the crimes charged. We find no prosecutorial misconduct in the elicitation of this testimony.

Defendants also argue that the government dramatically and improperly buttressed its position on the intimidating nature of the defendants by having the witness Kathleen Residence appear in disguise. We find nothing improper in the prosecution's behavior. The government made no improper prefatory remarks concerning her "disguise," and there is no evidence suggesting that the government had anything to do with her fashion choice; instead, the defendants highlighted that information on cross examination. In an apparent effort to show that the government purchased new clothes for the witness in exchange for her testimony, the defendants inquired about her clothes. She responded that she wore the clothes so that no one

would recognize her and that she would never wear them again. In response to this, defendants did not object. Defendants are entirely responsible for whatever prejudice flowed from this testimony. We find no prosecutorial misconduct.

■ Defendants also argue that the government improperly vouched for the credibility of its witnesses. In support of this argument, defendants cite *Gradsky v. United States*, 373 F.2d 706 (5th Cir.1967), in which the court awarded the defendant a new trial where the prosecutor said at trial,

[T]he government representatives don't put a witness on the stand unless there appears to be some credibility, until he appears to be a truthful witness.

Certainly the government has every opportunity to check out and to judge the credibility and truthfulness of Mr. Zane and Mr. Gilmore in this case, and in that context, we offered you their testimony.

*Id.* at 709–10 (emphasis omitted). Although that type of comment was clearly improper, the government's conduct in the instant matter is clearly distinguishable. First, the government made no such argument in our case. Second, to the extent that the prosecution bolstered the credibility of its witnesses, it did so as an appropriate response to defense attacks on the integrity of the prosecution. Throughout the trial, the defense suggested that the government manufactured the testimony of the cooperating witnesses, telling them exactly what to say regardless of its truth or falsity. The prosecution was within its rights in responding to this attack by eliciting rebuttal testimony from FBI witnesses and arguing in closing that the evidence

indicated that FBI witnesses spoke the truth.[10] *See DiPasquale*, 740 F.2d at 1296 (prosecutor may not abuse the prestige of his office, but "principle of prosecutorial restraint does not free a defense attorney to argue with impunity that the government wrote and directed a play"). Thus, we find no evidence of prosecutorial misconduct.[11]

■ Defendants also claim that during its closing, the prosecution made prejudicial references to them. Specifically, the defense takes issue with Mr. Pichini's reference to Francis Iannarella as a "cold-blooded killer," Mr. Gordon's reference during rebuttal, to the defendants as "Mafia killers," and an alleged reference to Phillip Narducci as a "baby-faced killer."[12] A prosecutor's characterization of a defendant does not justify the granting of a new trial where the characterization is supported by the evidence and, in the context of the trial as a whole, produces no significant prejudice to the defendant. *United States v. Taxe*, 540 F.2d 961, 967–68 (9th Cir.1976) (prosecutor's characterizations of defendant as a "scavenger", parasite", "fraud", and "professional con man", supported by the evidence and thus not prejudicial), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). *See also United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir.1978) (prosecutor calling defendant a "con man" and "hoodlum" supported by the evidence), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Williams*, 726 F.2d 661, 664 (10th Cir.) ("drug smuggler"), *cert. denied*, 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984); *United States v. Ong*, 541 F.2d 331

10. Prosecutor Gordon argued in his rebuttal: [T]he FBI agents in this case are not criminals. There's no evidence to indicate that they're the criminals. There's no evidence to indicate that those good men suborned perjury or made up anything and that's why the government brought them in so that you could judge their credibility from the witness stand.... [Y]ou decide if [the agents] put their jobs, their careers, and everything they worked for all those years on the line to fabricate testimony and put words in a witness's mouth.... (Tr. 11/16/88 at 175–76).

11. The Court also finds no merit to the contention that the prosecution pursued a theme of intimidation by assuring the jurors that because of their anonymity, they could feel free to convict the defendants. We find nothing in the record to support this position.

12. We can find no evidence in the record that such a comment was made. Even the prosecution did refer to Narducci in that light, it would not amount to prosecutorial misconduct. The evidence showed him to be a killer, and the term "baby-faced" does not raise any irrational passions when connected with the term "killer."

(2d Cir.1976) ("Chinatown's chief corrupter for 20 years"), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1559, 51 L.Ed.2d 780 (1977). In the instant matter, the references were clearly supported by the record.

■ Direct testimony from government witnesses suggested that defendants Iannarella and Narducci fatally shot several victims. For example, according to witnesses, Iannarella shot Robert Riccobene in the presence of Riccobene's mother who was screaming in horror, and then Iannarella smashed the mother in the head with his shotgun. (Tr. 11/11/88 at 115). In addition, the evidence suggested that Iannarella was involved in three other murders, and in one of these murders, he shot John Calabrese in the back. It would certainly be fair to characterize one who committed such acts as "cold-blooded." With regard to the reference to "Mafia killers," witnesses identified each defendant as a made member of the Mafia who participated in at least one (and usually several) Mafia-ordered murders or attempted murders. Again, based on the evidence, the prosecution fairly characterized them. In spite of these fair characterizations, the Court offered to give a cautionary instruction, and the defense declined. In addition, after making his comment about Iannarella, Mr. Pichini reemphasized that nothing in his closing argument was evidence; the closing, he stated, simply represents what the government submits the evidence to have shown. (Tr. 11/11/88 at 127). In the charge the Court told the jury:

> I also would like to add that when I told you that you should not act out of bias or prejudice that you should not let any reference to things like murders, killings, the mafia, terms like racketeering, arose (sic) any passion or prejudice, just because those are words used in some of the acts, some of the crimes that are charged.

> But you should consider the elements of the crimes to determine whether or not they're proven beyond a reasonable doubt. You should not let those terms arose (sic) any passion or prejudice.

(Tr. 11/17/88 at 31–32). The defendants were apparently satisfied with this instruction, and did not request further explanation or modification. We find no prosecutorial misconduct.

■ Defendants also argue that the government's treatment of Mr. Simone amounted to prosecutorial misconduct. Specifically, the defense asserts that (1) the government introduced photographs in which Simone appears with various defendants; (2) that government witnesses alleged that Simone engaged in unlawful conduct; and (3) that the prosecutor in his rebuttal argument made a comment about Simone appearing in one of the photographs. Defendants claim that these actions "caused severe and undue prejudice and hostility" toward defendants and lead defense counsel, depriving all defendants of a fair trial. We disagree.

By way of background information, racketeering act thirty-nine, in counts one and two of the instant indictment, charged defendants Scarfo and Iannece with the Hobbs Act extortion of Willard Rouse and Associates. In an earlier trial in May, 1987, a jury convicted Scarfo of this extortion. *See United States v. Scarfo,* 850 F.2d 1015 (3d Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). Iannece was a fugitive at the time, and the government had never prosecuted him in connection with the Rouse extortion. In a separate federal trial earlier in 1987, a jury convicted former Philadelphia City Councilman Leland Beloff and his legislative aide Robert Rego, coconspirators in the Rouse extortion with Scarfo and Iannece. The testimony of cooperating government witnesses Thomas DelGiorno and Nicholas Caramandi was central to the convictions of all four men. Beyond implicating Scarfo, Iannece, Beloff, and Rego, however, DelGiorno and Caramandi also implicated Mr. Simone, both as a conduit between the coconspirators for receiving instructions and supervision and as a person who was to share a split of the extortion proceeds. It was clear to all concerned, at least by the end of the Beloff and Rego prosecution, if not sooner, that the testimony of DelGiorno and Caramandi, if believed, estab-

lished Mr. Simone as an unindicted coconspirator in the Rouse extortion scheme.

Accordingly, before the Scarfo trial, the government filed a motion to disqualify Mr. Simone from representing Scarfo. Chief Judge Fullam, who had presided over the Beloff and Rego trial, concluded as follows:

(a) based on the evidence at the trial of Beloff and Rego, Mr. Simone should reasonably anticipate the need for his testimony as a witness at trial;

(b) testimony was offered at the Beloff trial that showed Mr. Simone to have been involved in the extortion scheme;

(c) the motion presents a problem of balancing the Code of Professional Conduct with Scarfo's Sixth Amendment right to counsel of his choice; and

(d) the constitutional provision takes precedence and Scarfo may continue to have Mr. Simone represent him, but:

(i) Mr. Simone may not cross-examine any witness who testifies concerning his involvement in the Rouse extortion, and

(ii) Mr. Simone will not be permitted to argue to the jury concerning the credibility of any witness who identified him as implicated in the extortion.

*United States v. Scarfo*, No. 86–00453–04, hearing at 9–13 (E.D.Pa. April 14, 1987). Scarfo elected to continue to have Mr. Simone represent him. Miles Feinstein appeared with Mr. Simone as co-counsel, the defense followed Chief Judge Fullam's ruling, and Mr. Feinstein performed those representational functions from which the Court foreclosed Mr. Simone.

In the instant matter, the same tension between the Code of Professional Conduct and Scarfo's Sixth Amendment rights arose because the Rouse extortion appeared in the indictment as a racketeering act. The government moved pretrial for the Court to place the same restraints on Mr. Simone's representation of Scarfo. Mr. Simone argued against the imposition of such strict limitations and other defense counsel supported him. No defendant supported the government's motion, and no defendant asked for a severance based upon possible prejudice resulting from Mr. Simone's participation in the trial.

This Court ruled somewhat more liberally than Chief Judge Fullam. The Court allowed Mr. Simone to cross-examine Del-Giorno and Caramandi but admonished him not to inject his own credibility into the proceedings. Likewise, the Court permitted Mr. Simone to make closing argument with the same restriction. (Tr. 9/9/88 at 51, 56). In addition, the Court colloquied Defendant Scarfo. After extensive discussion, Scarfo waived the right to call Mr. Simone as a witness, stated that he wanted Simone's representation although it could be limited and although Simone might be admonished, and stated that he understood that Simone might face a conflict of interest in the sense of protecting himself from accusations by witnesses to the possible detriment of Scarfo. (Tr. 9/9/88 at 52–57). The Court fully represented to Scarfo the risks inherent in allowing Simone to proceed as his counsel, but Scarfo adamantly declared that he wanted Simone as his attorney.

The government also pointed out that some of its evidence consisted of photographs in which Mr. Simone appeared. No defendant objected at this time, and Scarfo understood that the Court would not permit his attorney to testify through speeches or questions as to his version of what was happening in these pictures. (Tr. 9/9/88 at 56–57). Defendants now contend that the government used photographs showing Mr. Simone with one or more of the defendants to prejudice the jury as to Simone's integrity, thereby causing the jury to discredit counsel's cross-examination and arguments.

The government introduced over five hundred photographs in this case. Most of these photographs depicted groups of two or more defendants to show their association in fact. Mr. Simone, who was not a defendant, but who was implicated as a participant in the Rouse extortion, was depicted and identified in exactly *four* photographs in this trial.

Government Exhibit 656 was a photograph depicting defendants Leonetti and

Virgilio, Robert Simone, and two other individuals outside Scarf, Inc. (Scarfo's concrete contracting company in Atlantic City, New Jersey) on June 15, 1986. Before admitting the photograph, the Court held a side bar at which the government made an offer of proof concerning Mr. Simone's depiction in the picture. The prosecutor noted that the picture showed Simone at Scarf, Inc. at the time of the Rouse extortion and, therefore, corroborated Caramandi's testimony concerning Simone's participation in the scheme. The Court agreed that the photograph had heavy probative value, implicitly outweighing the danger of unfair prejudice. After the sidebar, the defense appeared satisfied with the Court's resolution. (Tr. 10/7/88 at 10). The government then offered Exhibit 656, and the witness identified Leonetti, Virgilio and Simone without objection. Later, the Court admitted it without objection. (Tr. 10/7/88 at pp. 43–44, 83). Before its admission, Mr. Simone cross-examined the agent witness through whom the photo was admitted:

> You've already acknowledged that there's nothing wrong with a lawyer ... being seen with his client, that would apply to me as well right?

The witness answered: "I guess so." (Tr. 10/7/88 at p. 67).

The Court properly performed the Rule 403 balancing test, and found that the probative value outweighed the danger of *unfair* prejudice. All evidence is inherently prejudicial; it is only unfair prejudice substantially outweighing probative value that permits exclusion of relevant evidence under Rule 403. *Thomas*, 676 F.2d at 244; *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979). These photographs were not likely to inflame the emotions of the jury, nor would they improperly imply any defendant's guilt. In fact, in his opening statement, Mr. Simone told the jury that it would be seeing his picture in photographs. He argued that the photographs were irrelevant because mere association is not evidence of guilt. (Tr. 9/28/88 at 124–25). No defendant asked for a severance or a mistrial as a result of admission of any of these photo-

graphs. Because the defense did not object, we will not grant a new trial unless the admission of these photographs constituted plain error. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (under F.R.Crim.P. 52(b), the plain error exception to the contemporaneous objection rule should be used sparingly, in circumstances where a miscarriage of justice would otherwise occur). As the Court held in *United States v. Helmel*, 769 F.2d 1306, 1318–19 (8th Cir.1985), surveillance photographs of defendants are relevant where they show coconspirators' physical association with each other, and tend to corroborate other evidence establishing the conspiracy. *See also United States v. Thomas*, 676 F.2d 239, 244 (7th Cir.1980) (photographs relevant and admissible where they depict defendants together at warehouse where they stored stolen cars), *cert. denied*, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981); *United States v. Anderson*, 676 F.Supp. 604, 607 (E.D.Pa. 1987) (photographs relevant and admissible where they corroborate other evidence of conspiracy); *United States v. Odom*, 348 F.Supp. 889, 894–95 (M.D.Pa.1972) (photos depicting stab wounds had probative value to corroborate government witnesses), *aff'd.* 475 F.2d 1397 (3d Cir.), *cert. denied*, 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973). The absence of any objection to the admission of the photograph further underscores the meritless nature of the defendants' position. *Odom*, 348 F.Supp. at 894. We find no prosecutorial misconduct.

The second and third photographs, Government Exhibits 752 and 753, depict Mr. Simone and others on defendant Scarfo's boat on February 2, 1986 in Fort Lauderdale, Florida. Number 752 shows Simone, defendant Leonetti and two other men who are not defendants in this case. Number 753 shows Simone and defendant Salvatore Wayne Grande. These two photographs are two of a series of three photographs showing passengers in the same boat trip. The third photograph, Government Exhibit 751, shows defendants Iannece and Iannarella on the boat. These photographs were relevant to demonstrate

the association of Leonetti, Salvatore Grande, Iannece and Iannarella, and were also relevant to show the association of Iannece and Mr. Simone, specifically with regard to the Rouse extortion which was in its early stages at the time the photographs were taken. The government offered and the Court admitted these photographs without objection. (Tr. 10/21/88 at 144–45); (Tr. 11/8/88 at 64–65). For the reasons discussed *supra*, admission of the photographs was a proper discretionary act.

The fourth photograph, Government Exhibit 759, depicts at a restaurant in Florida defendant Iannece, government witness Thomas DelGiorno, Robert Simone, and Philip McFillin, who had been identified as an LCN associate but who was not a defendant. This photograph was relevant to show the association of the defendants on various levels. It showed the association of McFillin with LCN members DelGiorno and Iannece. Testimony established that Scarfo, Leonetti, and Lawrence Merlino murdered Vincent Falcone in McFillin's residence (racketeering act three). Testimony also established that McFillin allowed the Mafia to use his pizza restaurant as the site of an LCN "making" ceremony in March, 1986. Thus, the photograph corroborated the testimony. In addition, this photograph shows an association between DelGiorno, Iannece, and Simone, all of whom were identified in testimony as the conspirators in the Rouse extortion, as far back as 1983. This photograph is corroborative of that association and tends to support the inference of a relationship of trust between the three that could blossom into an extortion conspiracy two or three years later. The government offered, and the Court admitted this photograph without objection. (Tr. 10/13/88 at pp. 43–44; 11/8/88 at pp. 43–64 to 43–65). For the reasons discussed *supra*, the Court did not err in admitting these photographs.

■ Defendants also claim that during his rebuttal, prosecutor Gordon prejudicial-ly showed a photograph to the jury of Mr. Simone with the Defendant Scarfo and said, "Look like a lawyer representing his client or does it look like somebody who might also be a friend?" [13] (Tr. 11/16/88 at 264). As noted previously, part of the relevancy of this photograph was to show the long-standing relationship of trust between Mr. Simone, Iannece, and DelGiorno in support of what the evidence showed to be their mutual participation in the Rouse extortion. Mr. Gordon made proper argument concerning this picture, and the defense did not object. Furthermore, prior to Gordon's rebuttal, Attorney Simone made his closing remarks on behalf of Scarfo. In that argument, Simone asserted to the jury: "I'm not ashamed to say Mr. Scarfo's a personal friend of mine." (Tr. 11/16/88 at 117). Obviously, in making this argument, and improperly injecting his credibility into the proceedings, Mr. Simone did not consider his personal friendship with Scarfo to be prejudicial. In addition, throughout the trial, the defendant characterized the photographs and their associations as innocent gatherings of friends. Attorney Gordon's rebuttal was an appropriate response to that position.

■ The defendants also assert that government witnesses made allegations of misconduct against Mr. Simone which, because he acted as lead counsel, severely prejudiced all defendants. Defendants cite specifically to one occasion where government witness Caramandi testified that the reason he began to cooperate with the government was that "Scarfo and Bobby Simone were going to kill me." (Tr. 10/29/88 at 124). At this point, the defense neither objected nor moved for a mistrial. Instead, the defendants and their attorneys erupted in derisive laughter, presumably to ridicule the witness and undermine his credibility. The government represented that no one expected Caramandi to claim that Mr. Simone was going to kill him. In previous trials when the govern-

---

**13.** Defendants actually allege that when making this comment, the prosecutor showed a photograph of Simone with Scarfo. Because this misstates the record, as no photograph was ad-mitted which depicted Simone and Scarfo together, we will assume that defendants are referring to the photo and the comment to which we refer.

ment asked Caramandi this question, he only mentioned concern about Scarfo. (*See* Tr. 10/31/88 at pp. 4–5). We accept these representations of the government and do not find that the prosecutors made any effort to discredit Mr. Simone. In addition, out of an abundance of caution, Mr. Pichini suggested and Mr. Simone agreed that the government should ask the witness a curative series of questions. Accordingly, when direct examination resumed the next day, Pichini asked Caramandi, among other things, whether Mr. Simone was one of the individuals that was going to kill him. Caramandi asserted that he was not. Apparently satisfied, the defense did not object to this resolution.

Although defendants do not specifically refer to it, there was one other incident in the trial where a witness testified in an unflattering fashion about Mr. Simone. Thomas DelGiorno testified about the Rouse extortion and explained various aspects of Simone's participation. For example, Scarfo told DelGiorno that Simone had outlined the extortion scheme to him (Tr. 10/13/88 at 20); Iannece told DelGiorno he had discussed the Rouse extortion with Scarfo who determined that in distributing the proceeds, Mr. Simone would receive 10% (Tr. 10/13/88 at 22–23); and Scarfo told Caramandi to deal with Simone concerning City Councilman Beloff (Tr. 10/13/88 at 26–29). With the exception of an objection to a question concerning Mr. Simone's relationship with Beloff, the defense did not object to any of this testimony. Then DelGiorno described a meeting he had with Mr. Simone shortly after Beloff, Rego, and Caramandi were arrested for the Rouse extortion. Simone told DelGiorno he had a very serious problem with Rego who could really hurt him. DelGiorno offered to see Scarfo to get approval to kill Rego. He explained further that he did this because he thought Simone was asking to have Rego killed. Mr. Simone objected and asked that the Court strike the testimony because this was inadmissible opinion evidence. The Court granted the motion to strike and instructed the jury to disregard the testimony. Apparently satisfied with this resolution, no defendant moved for a

mistrial or a severance. (Tr. 10/13/88 at 34–35).

We conclude that this testimony did not unfairly prejudice defendants. First, the defendants did not object to the resolution of these matters. The absence of objection to remarks at the time of their utterance weighs heavily in the determination that they were not actually prejudicial. *United States v. Odom,* 348 F.Supp. 889, 894 (M.D. Pa.1972), *aff'd,* 475 F.2d 1397 (3d Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed. 2d 72 (1973). Even had the defense objected, the remarks of the witnesses in the context of the entire trial would not constitute prejudice. We do not find that the testimony prejudicially compromised the credibility of Mr. Simone. The limited case law in this area supports our conclusion.

In *United States v. DeLuna,* 763 F.2d 897, 916–17 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985), the defendants claimed that they suffered irreparable damage and prejudice because a cooperating government witness testified concerning an alleged impropriety by the defendant's attorney. Among other things, the witness charged that a former partner of the defendant's lawyer asked him to lie under oath in another proceeding. The defendants moved for a mistrial and then a severance, and the Court denied both motions. The Eighth Circuit upheld the convictions, on the grounds that the exchange was brief in the context of the trial and that it did not constitute Fed.R. Evid. 404(b) material. *Id.* In *United States v. Friedman,* 593 F.2d 109 (9th Cir. 1979), a cooperating government witness accused the defendant's attorney, who was previously the witness's attorney, of encouraging him to falsely refuse to implicate the defendant. The defendant moved for a mistrial on the grounds that the prejudicial effect of this testimony vastly outweighed any probative value. The district court denied the motion. The Ninth Circuit examined the potential prejudice, the remedial effect of curative instructions, and the opportunity available to the appellant to minimize whatever prejudice resulted, and concluded that the statement did not unfairly

prejudice the defendant. *Id.* at 120–21. *See also Jackson v. Scully,* 781 F.2d 291, 298 (2nd Cir.1986) (in light of curative measures, witness's one-sentence remark about defense counsel not prejudicial). In the instant matter, especially in light of the defendants' failure to timely object, and additionally because their contentions are without merit, we find no prosecutorial misconduct and no error.

██ Defendants also argue that government witness Michael Madgin prejudiced them with his reference to Mr. Santaguida, counsel for defendant Frank Narducci, Jr. Shortly before trial began, the government learned from cooperative government witness Michael Madgin that Mr. Santaguida represented him in a state drug prosecution. During that trial, Madgin contended that he took the witness stand and lied under oath, falsely denying culpability, and that he did this with the foreknowledge and encouragement of his attorney. The government immediately reduced this information to a memorandum and provided it to the defense and the Court as potential Jencks/Brady material. In the instant case, the Court conducted a colloquy with defendant Frank Narducci and established that he was aware of this information and was nonetheless satisfied to proceed with Mr. Santaguida as his counsel. (Tr. 9/8/88 at 67–71).

After informal discussions between the prosecution and the defense, they agreed that the prosecution would elicit the fact of the perjury on direct examination without mentioning Mr. Santaguida, and that the defense would avoid raising the issue. Nevertheless, one of the defense attorneys who cross-examined Madgin continually ventured into the area. (Tr. 10/20/88 at 114). At one point, the defense attorney asked him what the maximum sentence was that he faced. Madgin said that he did not know. Counsel pressed him to answer whether anybody had discussed the potential sentence with him. Madgin struggled to remember and then said: "Sure. Joe Saniquito (sic) went over it with me." Counsel said, "Fair enough" and continued his cross-examination. No one referred to the perjury at this point, and Madgin did not explicitly identify Mr. Santaguida as his lawyer. No defendant objected or moved for a mistrial or a severance. (Tr. 10/20/88 at 140). At this stage, defendants claim that the government, through Madgin, gave the jury the impression that the defense attorneys and the defendants condoned Madgin's perjury. We find this contention meritless.

Counsel for a defendant, not the government, brought out this information. Counsel pressed the witness on the issue of whether he knew his maximum prison exposure, asking incredulously, "You never— nobody ever told you that." Madgin then responded that Joe Santaguida had told him. This was a direct and appropriate response to the question. Furthermore, no one linked Santaguida to the perjury. It is doubtful that the jury associated this case as the case in which the witness admitted lying under oath. Such a connection is purely speculative, and the likelihood of prejudice is slight.

In addition, it is hornbook law that injection of inadmissible evidence attributable to the conduct of the defense is not reversible error. *All American Life & Casualty Co. v. Oceanic Trade Alliance Council International Inc.,* 756 F.2d 474, 479–80 (6th Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 55 (1985); *United States v. Nichols,* 695 F.2d 86, 92 (5th Cir.1982); *United States v. Lerma,* 657 F.2d 786, 788 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982). Having deliberately pursued a line of inquiry that created a risk for prejudice, the defense cannot later seek relief from the results of that strategy. Again, because the defendants did not object, we would grant a new trial only if we committed plain error. We can find no error and thus deny defendants' motion.

██ The defendants also contend that prosecutor Gordon's rebuttal argument concerning a five hundred-piece puzzle and the use of an exhibit was confusing and prejudicial, and enabled the jury to disregard the Court's jury instructions. In his opening for the government, Mr. Wicks

compared the evidence to pieces of a puzzle. In his closing, Mr. Jacobs, counsel for Salvatore Merlino argued that some pieces of the puzzle were missing; therefore, he argued, there was reasonable doubt. In rebuttal Mr. Gordon conceded that there were pieces missing but suggested to the jurors that if only eight pieces of a five hundred-piece puzzle were missing they likely would not have a reasonable doubt as to what the puzzle depicted. (Tr. 11/16/88 at 304–05). Mr. Jacobs objected and asked that the Court immediately give a curative instruction. (Tr. 11/16/88 at 307). In an abundance of caution, the Court gave a curative instruction. (Tr. 11/16/88 at 308–09). The defense did not request a further instruction and did not move for a mistrial.

Throughout the jury charge, the Court instructed the jury concerning reasonable doubt. (*See e.g.,* Tr. 11/17/88 at 11–13). The defense did not object to the Court's explanation of reasonable doubt. It is pure speculation to conclude that Mr. Gordon's brief reference to the puzzle analogy during rebuttal argument prevented the jury from following the Court's instructions. Therefore, we deny defendants' motion.

*Sufficiency of the Evidence*

Several defendants raise various arguments concerning the sufficiency of the evidence presented against them. Defendants request acquittals under F.R.Crim.P. 29 and/or new trials under F.R.Crim.P. 33.[14] In determining sufficiency of the evidence, the Court is not to weigh the evidence or determine credibility of witnesses, but rather to give the government the benefit of all reasonable inferences and view the evidence in the light most favorable to the government; the Court must then determine whether a rational jury could conclude beyond a reasonable doubt that the defendant committed the crimes charged. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Stewart,* 806 F.2d 64, 67 (3d Cir.1986); *United States v. Grayson,* 795 F.2d 278, 281 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93

L.Ed.2d 978 (1987). We will address each defendant's arguments in turn.

■ Defendant Pungitore argues that the evidence against him as to racketeering act five (Narducci murder) was insufficient to sustain a verdict guilt because the government presented conflicting testimony regarding his participation in the Narducci murder. Thomas DelGiorno testified that defendant Pungitore told him that he, Joseph Pungitore, and Salvatore Testa shot Frank Narducci, Sr. (Tr. 10/10/88 at 119). He also testified that Testa confirmed that Testa and Pungitore were the two who shot Narducci. Nicholas Caramandi, however, testified that Testa told him that the second shooter was *not* Joseph Pungitore. Defendant Pungitore argues that this conflicting evidence is insufficient to establish guilt because the jury was forced to "guess" as to the accuracy of the two contradictory accounts. Defendant's position is meritless.

■ Defendant misunderstands the distinction between the sufficiency and the quality of evidence. This Court may not grant a motion for acquittal based on conflicting testimony, that is, testimony of a questionable quality; it is up to the jury to weigh conflicting testimony, determine credibility, and ultimately draw factual inferences. *United States v. Beck,* 615 F.2d 441, 448 (7th Cir.1980). *See also United States v. Adamo,* 742 F.2d 927, 935 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985) (weighing conflicting evidence not relevant with regard to Rule 29 insufficiency standard). The Court must grant a motion for acquittal only when the evidence, viewed in a light most favorable to the prosecution, is so scant, so insufficient, that the jury could only speculate as to the defendant's guilt. As long as a rational jury could conclude beyond a reasonable doubt that the government has proved all elements of the offense charged, the motion should be denied. *United States v. Martorano,* 596 F.Supp. 621, 624 (E.D.Pa.1984), *aff'd,* 767 F.2d 63 (3d Cir.), *cert. denied,* 474 U.S. 949,

---

**14.** In pertinent part, F.R.Crim.P. 33 provides that "[t]he court on motion of a defendant may

grant a new trial to that defendant if required by the interests of justice."

106 S.Ct. 348, 88 L.Ed.2d 296 (1985). In the instant matter, if the jury chose to believe the testimony of Thomas DelGiorno, the evidence was clearly sufficient to sustain the verdict. Therefore, we deny defendant Pungitore's motion.

■ Defendant Pungitore also argues that the evidence of collection of unlawful debt number five was insufficient because the prosecution offered no proof of the legal rate of interest in Pennsylvania and did not request that the Court take judicial notice of the rate. At trial the Government presented evidence that Joseph Pungitore and Michael Madgin were partners in a usurious loan business that loaned money at various rates, including annualized rates of 104% and 156% per year. During jury instructions, The Court charged the jury, in pertinent part, as follows:

I had told you that the term unlawful debt referred to two types of debt ... the second type of debt which is unenforceable in whole or in part as to principal or interest because of state laws relating to usury must be incurred in connection with the business of loaning money at a usurious rate that was at least twice the enforceable rate.

Now again, I don't want. to refer to specifics and I don't want to get into the laws of Pennsylvania pertaining to interest, but if you believe the testimony of the government, and whether or not you do is up to you, but if you believe this testimony—I think it was testimony about rates of 100 percent or more—I would tell you that that would exceed the lawful rate in Pennsylvania. There are a number of different rates in Pennsylvania, depending upon whether you're just loaning money or you have a mortgage or you have this or that, but if you believe rates in excess of 100%, in that area, then that would be at least twice the enforceable rate.

(Tr. 11/17/88 at 62–63). No defendant objected to this charge during the trial, and defendants have failed to persuade the Court that it invaded the province of the jury. The prosecution is not required to prove Pennsylvania law as though it were an adjudicatory fact; rather, the Court is required to take judicial notice of relevant statutory and case law of any state without plea or proof. 1 J. Weinstein & M. Berger, *Evidence* § 200(02) at 200–8 (1988) (citing *Schultz v. Tecumseh Products*, 310 F.2d 426, 433 (6th Cir.1962)); *United States v. Atwell*, 71 F.R.D. 357, 361–62 (D.Del.1976), *aff'd.* 559 F.2d 1209 (3d Cir.1977). The Court took notice of Pennsylvania's usury laws and provided the jury with an accurate and comprehensible synopsis of those laws.[15] The Court did not direct a verdict for the prosecution on the point, but merely told the jury that *if* it believed the testimony of the government concerning rates in excess of 100%, that rate would exceed by two times the lawful rate in Pennsylvania. Because this was an entirely accurate summation of the law, and because the Court

**15.** As the Government correctly points out in its brief at pages 30–31, Pennsylvania's usury laws are complex. Basically, 41 Pa.Stat.Ann. § 201 (Purdon Supp.1988) establishes a general rule that 6% per annum is the maximum lawful rate of interest that may be charged on cash loans of $50,000 or less. Higher interest rates are unenforceable unless they are authorized by statute. This general rule is subject to a host of exceptions, such as special rates, both fixed and flexible, for loans by various types of financial institutions and retail merchants. None of these exceptions apply and no defendant suggested otherwise. Furthermore, Pennsylvania's RICO statute makes it a crime to collect debts which arise from the lending of money at a rate of interest exceeding 25% per annum unless such a rate is expressly authorized by law. 18 Pa.Cons. Stat.Ann. § 911(h)(1)(iv) (Purdon 1983). As a matter of Pennsylvania common law, an agreement is unenforceable if it cannot be performed without violating a statute. *Gramby v. Cobb*, 282 Pa.Super. 183, 422 A.2d 889, 892 (1980). *See also Bauman & Vogel, C.P.A. v. DelVecchio*, 423 F.Supp. 1041, 1044 (E.D.Pa.1976); *Fitzsimons v. Eagle Brewing Co.*, 107 F.2d 712, 713 (3d Cir.1939). There are only a handful of exceptions to the Pennsylvania RICO statute's 25% per annum interest ceiling (e.g., loans to business corporations for true business purposes, loans collateralized by the pledge of securities, etc.) and none of these exceptions were applicable to the facts of the instant case. Therefore, loans at an interest rate of more than 50% per annum (i.e., twice the enforceable rate under Pennsylvania law using 25% as the enforceable rate) are unlawful debts as defined in 18 U.S.C. § 1961(6) and used in 18 U.S.C. §§ 1962(c) and (d).

**1336**

did not instruct the jury to accept the testimony of the government's witnesses, defendant's position is without merit.[16]

▉ Count Six of the indictment charged that defendant Ciancaglini did distribute and cause to be distributed fifty pounds of methamphetamine in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. Defendant Ciancaglini contends that the government presented insufficient evidence both of a completed delivery and of the nature of the substance. With regard to the distribution of methamphetamine, the testimony of Thomas DelGiorno comprised the government's evidence. (Tr. 10/12/88 at 30–37); (Tr. 10/14/89 at 193). DelGiorno described how he arranged for Vinnie Perry to buy methamphetamine from John Santilli for $10,000 per pound with $3,000 per pound to go to DelGiorno, Joseph Ciancaglini, Salvatore Merlino and Nicodemo Scarfo. During his testimony about this crime, the government questioned DelGiorno, and he responded as follows:

Q. And on that first series of transactions that you participate in, *how much money did you make?*

A. On that whole deal then?

Q. Yes.

A. $150,000.

Q. And approximately *how many transactions were there* at that time?

A. About ten. Ten or five. Five or ten.

Q. How many pounds *were involved?*

A. Fifty.

(Tr. 10/12/88 at 31–32) (Emphasis supplied). It is clear from DelGiorno's description in the past tense of the amount of money made, the number of transactions that occurred, and the quantity of methamphetamine distributed that, contrary to defendant's claim, there were completed deliveries. The jury did not have to rely on drawing reasonable inferences; rather, they had direct testimony about the com-

pleted distribution of methamphetamine from one named person to another.

With regard to the type of substance involved, DelGiorno referred to the substance delivered as "meth an illegal drug" and "methamphetamine". (Tr. 10/12/88 at 30, 33). He further testified as follows:

Q. The way you schemed this out, is you got a willing buyer who had cash.

A. Right.

Q. And you put him together with the willing seller who had drugs.

A. Right.

(Tr. 10/14/88 at p. 194). It was reasonable and proper for the jury to conclude from this direct evidence that completed distributions involving the illegal drug, methamphetamine, had in fact occurred. In addition, "[t]he fact that a high price has been paid for the substance is also evidence tending to indicate that it was in fact [a narcotic]." *United States v. Atkins,* 473 F.2d 308, 314 (8th Cir.), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2751, 37 L.Ed.2d 160 (1973). The evidence indicated that rather than one isolated sale, there was a series of transactions between the same buyer and seller. From that evidence, the jury could reasonably infer that the buyer had in fact received methamphetamine on each occasion in return for his purchase price of $10,000 per pound:

[T]he existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists so long as the evidence furnished ground for inferring that the material in question was narcotics.

*United States v. Agueci,* 310 F.2d 817, 828 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 1016, 10 L.Ed.2d 11, 12 (1963). The government's evidence with regard to both the delivery and the illegality of the substance was clearly sufficient. Defendant's motion is denied.

---

**16.** We also must point out that the defense had notice and opportunity to assist the Court in determining the applicable Pennsylvania law and chose not to address the issue at any time during the trial.

■ Defendant Lawrence Merlino argues that the evidence against him as to racketeering act eleven (conspiracy and attempted murder of Robert Riccobene) was insufficient to sustain a verdict of guilt. In pages twenty-three through twenty-nine of its brief, the government cites to repeated testimonial evidence which clearly supports the verdict. It is obvious from their citations to the record that a jury could conclude that defendant Merlino played an ongoing role in the effort to locate and murder Robert Riccobene. The testimony suggested that on several occasions, he met with other coconspirators to discuss plans to kill Riccobene. For example, on one occasion, according to the testimony of Nicholas Caramandi, defendant Merlino was parked in a car on the corner of 10th and Moore prepared to kill Robert Riccobene. (Tr. 10/27/88 at 58–59). Caramandi testified to several other occasions during which Merlino engaged in plans to kill members of the Riccobene faction. (Tr. 10/27/88 at 53–60); (Tr. 10/11/88 at pp. 13–18). Given the obvious sufficiency of this evidence, defendant's motion is denied.

■ Defendant Nicholas Virgilio argues that the government presented insufficient evidence of his involvement in racketeering acts twenty-four and twenty-five, the extortions committed as part of the Philadelphia LCN's shakedown operation, and thus his convictions on the substantive RICO count can not be sustained. Virgilio argues that the evidence failed to link him to the extortions or prove his criminal knowledge, intent, or conduct. We disagree.

According to the evidence, Virgilio had a longstanding relationship with Nicodemo Scarfo. When Scarfo was a mob soldier, Virgilio and Scarfo joined together to murder Judge Edwin Helfant. (Tr. 10/10/88 at 129, 133–35). Later, when Scarfo took over as the mob's leader, Virgilio became a "made" member of LCN. (Tr. 10/10/88 at 140). Virgilio was also closely tied to mob underboss, Phil Leonetti. (Tr. 10/12/88 at 39).

In the same year that Virgilio joined the Philadelphia mob, Scarfo instituted a widespread shakedown operation that was financially rewarding to both mob soldiers and supervisors. Scarfo approved the implementation of a mafia "street tax" upon individuals involved in criminal activity who were not "connected" with LCN members. The shakedown operation relied upon force and threats to collect substantial revenue from hundreds of victims. (Tr. 10/27/88 at 113–19); (Tr. 10/12/88 at 36, 47–49); (Tr. 10/27/88 at 117, 127–28).

In addition, the shakedown operation was extremely notorious on the streets of Philadelphia. (*See* Gov.Ex. 1346, 1347, 1348, 1349, 1358; Tr. 10/12/88 at 105, 114–28; Ex. 1303, 1319, 1320, 1309, 1311, 1312, 1313). Several groups of mafia members formed shakedown crews, and the mob imposed and enforced the street tax in a manner intended to convey to the criminal community its power and ubiquity. For example, when Lou Turra refused to pay the street tax and did not demonstrate the proper respect for the Mafia, seven mobsters publicly beat up Turra on a busy street in the Society Hill section of Philadelphia. (Tr. 10/12/88 at 77–79). Scarfo approved and encouraged the beating. (Tr. 10/12/88 at 78).

Although Virgilio may not have directly participated in the shakedowns, he did receive a portion of the funds for performing errands or jobs for Scarfo. (Tr. 10/12/88 at 66–68). The shakedown money that was delivered to Scarfo was clearly identified as such and had a slip with the notations of "Elbow" and "Extra" to designate that the revenue came from shakedowns. (Tr. 10/12/88 at 70–71); (Tr. 10/28/88 at 10–24). The evidence is overwhelming that Virgilio knew how his income was generated. He had a longstanding relationship with Scarfo and Leonetti, (*see e.g.*, surveillance photos Ex. G–607, 608, 615, 616, 618, 635, 636, 637, 638, 639, 647, 650, 655, 692, 693, 699, 715, 761, 797, 798, 799, 802), and joined an organization whose objectives were clearly criminal. The shakedown operation was the centerpiece of Scarfo's lucrative criminal enterprise. Under such circumstances, the jury could reasonably conclude that Virgilio was an participant in

**1338**

the shakedown operation. *See United States v. Martorano*, 557 F.2d 1, 8 (1st Cir.1977) (defendant collected interest payments for loanshark; jury could conclude that defendant was more than errand boy and was part of operation), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978).

Virgilio's participation in the extortionate activity constitutes a violation of the crime of extortion under Pennsylvania law and a predicate offense under the RICO statute. Section 1961 of the federal RICO statute defines racketeering activity as "Any act or threat involving ... extortion which is chargeable under state law and punishable by imprisonment for more than one year." "Involving" has long been construed rather broadly by the Third Circuit and other Circuit courts. For example, in *United States v. Forsythe*, 560 F.2d 1127, 1134–35 (3d Cir.1977), the court held that "to interpret state law offenses to have more than a definitional purpose would be contrary to the legislative intent of Congress and existing state law." *See also United States v. Manzella*, 782 F.2d 533, 537 (5th Cir.) ("involving" language of RICO allows for conspiracy to commit arson to constitute predicate act even though only "arson" is explicitly mentioned in the RICO statute), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986); *United States v. Ruggiero*, 726 F.2d 913, 919 (2d Cir.) (conspiracy to commit murder is an act or threat involving murder), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). "Chargeable under state law" means that the offense must be one that generically was chargeable under state law at the time it was committed. *See United States v. Qaoud*, 777 F.2d 1105, 1118 (6th Cir.1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Frumento*, 563 F.2d 1083, 1087 (3d Cir.1977) (reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978).

The indictment charges racketeering acts twenty-four and twenty-five as violations of 18 Pa.Con.Stat.Ann. § 3923 (Purdon 1983), Theft by Extortion, a felony punishable by more than one year imprisonment. Virgilio does not dispute that the monies collected from John Hartung and Jerry Slobotkin, the victims in racketeering acts twenty-four and twenty-five, were obtained by Virgilio's codefendants and coconspirators through extortionate means as part of the shakedown operation. The provisions of the Pennsylvania Crimes Code provide that this extortion is a type of theft. Therefore, these street tax collections are extortions by theft and the knowing receipt of these monies renders the recipient, such as Virgilio, guilty of receiving stolen property under Pennsylvania law. *See* 18 Pa.Cons.Stat.Ann. § 3925 (Purdon 1983). Under the Pennsylvania law consolidating theft, *see* 18 Pa.Cons.Stat.Ann. § 3902 (Purdon 1983), and *Commonwealth v. Lewis*, 299 Pa.Super. 367, 445 A.2d 798, 800 (1982), Virgilio is as guilty of an act involving extortion in receipt of the extorted monies as the individuals who personally committed the extortionate act.[17] Thus, the evidence was sufficient to sustain a guilty verdict as to racketeering acts twenty-four and twenty-five, and the substantive RICO count. Defendant's motion is denied.

Virgilio also challenges his conviction under the RICO conspiracy count.[18]

17. If nothing else, Virgilio's conduct renders him guilty as an aider and abettor. Virgilio received the extortionate monies and performed errands as part of the ongoing shakedown operation. The scheme involved collection of monies from victims on a continuing basis and distribution of the monies within a structured criminal enterprise. The Court instructed on the law of aiding and abetting, (Tr. 11/17/88 at 34–36, 68), and on this additional theory the record supports convictions on both of the shakedown racketeering acts.

18. The defense contends that, as required by *Marshall Silver Construction Co., Inc. v. Mendel*, 835 F.2d 63 (3d Cir.1987), the government failed to show that the enterprise had sufficient continuity to be actionable under RICO. This argument requires little response, for the proof of the mob as an enterprise and the criminal activities of the mob as the pattern of racketeering

The Third Circuit defined the elements of a RICO conspiracy in *United States v. Adams,* 759 F.2d 1099 (3d Cir.), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed. 2d 236 (1985). The Court held that to convict under RICO conspiracy, a defendant need not agree to commit personally the predicate acts alleged in the indictment. Rather, the defendant must agree that *some* conspirator, not necessarily the defendant himself, would commit two or more predicate acts. *Id.* at 1116. To establish guilt under the RICO conspiracy charge, the government has to introduce evidence that the defendant agreed to join the enterprise or participate in the affairs of the enterprise and agreed to the commission, by some conspirator, of at least two predicate acts. In concluding that the defendant does not have to agree personally to commit the predicate acts, the Third Circuit was persuaded by the express language and the Congressional history of the statute:

> We are particularly impressed by the analysis of Judge Johnson in *United States v. Carter,* 721 F.2d [1514] at 1528–31 [ (11th Cir.1984) ] and adopt that reasoning as our own. As the Eleventh Circuit noted, the statutory language itself does not require the personal commission of predicate offenses. "When read together, the statutes speak only to 'conspiring to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, i.e., two acts of racketeering activity within at least ten years of each other.' " *Id.* at 1529. Moreover, requiring the government to prove that each defendant agreed to commit personally two predicate acts would severely dilute the effectiveness of the RICO conspiracy remedy, and thwart Congress's objectives in enacting those statutes. *See id.; United States v. Local 560, International Brotherhood of Teamsters,* 581 F.Supp. 279, 331 (D.N.J.1984).

The enterprise in this case is the Philadelphia LCN. The evidence of Virgilio's activity represents a classic example of RICO agreement to join the enterprise and participate in its affairs is abundantly clear from his criminal association with Scarfo in the late 1970's and his joining the Philadelphia LCN in 1982. Indeed, it is hard to imagine a more formalized criminal agreement than the one involved in becoming a member of the Mafia.

To become a mob member under Scarfo, Virgilio had to participate in a murder. Virgilio satisfied this requirement with his killing of Judge Helfant. After Virgilio was proposed for membership by Philip Leonetti, he became a "made" member of the mob through a "making ceremony" that marked formal entry into the nationwide criminal organization. During the making ceremony Virgilio had to agree to use a gun and knife for members of the mob, and had to swear an oath of loyalty to the mob and its members. (Tr. 10/10/88 at 123) (10/16/88 at 187–88). This initiation rite, combined with the formal structure of the Mafia and the purposes of the criminal organization, provides unequivocal and evidence of an agreement to join the enterprise and participate in its affairs.

With respect to the second component of a RICO conspiracy, that the defendant join the enterprise agreeing that other coconspirators would commit at least two racketeering acts, the evidence clearly establishes that, as discussed *supra,* Virgilio knew and had reason to know of the existence of the shakedown operation and its importance to the mob. Literally hundreds of shakedown victims paid a street tax that provided a steady and lucrative stream of revenue for the mob. When Virgilio joined the Mafia, he was certainly aware of its many illegal endeavors. For example, he knew that murder was a predicate act for membership, and because he received monies from Scarfo from the division of the street tax, it is clear that Virgilio approved of and participated in these extortions. Defendant's motion is denied.

■ Defendant Joseph Grande argues that the government presented insufficient evidence to sustain a conviction on the predicate act extortions. There is an abundant continuity.

dance of evidence to support the predicate act extortions. Both Thomas DelGiorno and Nicholas Caramandi testified that Joseph Grande was involved in the mob's widespread shakedown operation. Caramandi, who was a member of one of the original shakedown crews, testified that he knew from personal conversations with Joseph Grande that Grande was also involved in shakedowns. (Tr. 10/28/88 at p. 25). DelGiorno testified that Grande received proceeds from the shakedown collections from LCN boss Nicodemo Scarfo and that Grande performed services such as delivering the shakedown monies to Scarfo in Atlantic City and returning to Philadelphia with DelGiorno's "split" of these monies. (Tr. 10/12/88 at p. 70–71). The government also introduced a recorded conversation between DelGiorno and defendant Salvatore Wayne Grande intercepted by the government on August 30, 1985 before DelGiorno began cooperating with law enforcement authorities. In the recording, DelGiorno spoke at length about Joseph Grande's involvement in a shakedown with codefendant Eugene Milano. (Ex. 1351 at pp. 22–26) (Tr. 10/12/88 at 120–27). This evidence, combined with the evidence of the shakedown operation as set forth in our analysis of defendant Virgilio's motion, *supra*, establishes both the defendant's knowledge and involvement in the shakedown operation. In addition, John Leone testified that defendants Joseph Grande and Salvatore Scafidi approached him and shook him down for $200 a week because Leone did not show respect to Scarfo at a wedding. When Leone asked to talk directly to "Nicky", Grande and Scafidi responded, "[W]e're Nicky." (Tr. 11/7/88 at 13–14).

 Defendant Grande also argues that because it was uncorroborated, the evidence of the murder and attempted murder predicate acts was insufficient to sustain a conviction. To the contrary, the testimony concerning these acts was corroborated by substantial evidence, including 1982 recorded conversations in which various defendants and coconspirators discuss the stalking and killing of members of the Riccobene faction of the mob. (Ex.

1301, 1302); (Tr. 10/27/88 at pp. 7–15). Even if there were no corroboration, a court can sustain a conviction on the uncorroborated testimony of an accomplice. *United States v. Projansky,* 465 F.2d 123, 136–37 n. 25 (2d Cir.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). Moreover, the Court properly instructed the jury on the evaluation of testimony from accomplices and immunized witnesses, and the defense did not except to the charge. Therefore, defendant's motion is denied.

### *Failure to Grant Severance*

 Defendant Pungitore argues that the Court erred in denying his pretrial motion for a severance. In pertinent part, F.R.Crim.P. 8(b) provides that

[t]wo or more defendants may be charged in the same indictment of information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

In pertinent part, F.R.Crim.P. 14 provides that

[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses of defendants ... for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Defendant argues that even if joinder were proper under Rule 8, the Court should have granted a severance because the joint trial prejudiced defendant Pungitore. The Court concludes that a severance was not appropriate for Joe Pungitore or any other defendant in this case.

The seventeen defendants in this case were all charged in both counts one and two of the indictment, the RICO counts. Therefore, under F.R.Crim.P. 8(b), joinder of defendants was proper. In support of his pretrial motion for severance, defendant Joseph Pungitore cited several reasons which the Court found unpersuasive. First, Pungitore argued that he was indicted with numerous codefendants. This fact

does not justify severance since the rules providing for joinder of defendants contemplate multi-defendant trials and are designed to promote judicial economy and avoid multiple trials involving the same witnesses and evidence. Second, Pungitore argued that the defenses to be presented by the defendants could be materially different and mutually exclusive. This did not occur at trial, nor did any defendant attempt to present such a defense; rather, all defense counsel presented a unified defense on behalf of all defendants. Third, Pungitore argued that the joint trial of these defendants would create a situation in which a defendant who chooses to testify will become an unwitting government witness against his codefendant thus enabling the government to obtain testimony which would otherwise be unavailable to it. No defendant testified at trial or represented that but for the above reason, he would have testified. Fourth, Pungitore argued that the joint trial of these defendants will impose upon each defendant the unconstitutional burden of being forced to testify or remain silent in the face of accusatory testimony for a codefendant who chooses to testify on his own behalf. Because no defendant testified or indicated a desire to testify, this problem did not arise. Fifth, Pungitore argued that the joint trial of these defendants would prevent him from calling as a witness his codefendant because of the codefendant's right to remain silent, whereas in separate trials, each defendant could subpoena his codefendant as a witness. The record does not indicate that any defendant possessed information which would have been helpful to a codefendant in a separate trial. Furthermore, even had separate trials been granted, it is highly unlikely that an indicted coconspirator would have waived his privilege against self-incrimination and testified on behalf of another coconspirator.

In his posttrial motions, defendant Pungitore argues that the Court should have granted a severance because a multi-defendant trial allows for the transference of guilt from one defendant to another. He also argues that he was prejudiced because witnesses DelGiorno and Caramandi impli-cated Mr. Simone, counsel for defendant Scarfo, in "serious criminal misconduct," and the Court disarmed Simone in ordering him not to inject his credibility into the case.

■ The general rule regarding severance is that persons jointly indicted should be jointly tried. *United States v. Frumento*, 409 F.Supp. 143, 144 (E.D.Pa.1976), *aff'd on other grounds*, 559 F.2d 1209 (1977); *United States v. Clark*, 398 F.Supp. 341, 354 (E.D.Pa.1975), *aff'd* 532 F.2d 745 (3d Cir.1976). To secure a Rule 14 severance, the defendant must establish that joinder is prejudicial to the point that the defendant will be denied a fair trial. *United States v. Gorecki*, 813 F.2d 40, 43 (3d Cir.1987); *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir.1985), *cert. denied*, —— U.S. ——, 108 S.Ct. 725, 98 L.Ed. 2d 673 (1988). Under Rule 14, the movant carries the heavy burden of showing severe prejudice caused by the joinder of defendants. *United States v. Adams*, 759 F.2d 1099, 1112 (3d Cir.), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). Bare allegations without a specific showing of prejudice, fail to meet the stringent requirements for a Rule 14 showing of prejudice. *Gorecki*, 813 F.2d at 43 (3d Cir.1987); *United States v. Armocida*, 515 F.2d 29, 46 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). A defendant must show more than the fact that a separate trial might offer him a better chance of acquittal. *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir.1981); *United States v. Iezzi*, 451 F.Supp. 1027, 1033 (W.D.Pa.1976), *aff'd United States v. Boscia*, 573 F.2d 827 (3d Cir.) *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). He must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial. *Reicherter*, 647 F.2d at 400. The determination of Rule 14 motions rests with the sound discretion of the trial court. *Id.* The denial of a Rule 14 motion will not be disturbed on appeal, absent an affirmative showing that the Court's ruling resulted in such prejudice to the defendant as to constitute an abuse of discretion.

*United States v. DePeri,* 778 F.2d 963, 984 (3d Cir.1985).

In the instant matter, to ensure that the jury would compartmentalize the evidence and not transfer guilt, the Court instructed the jury to judge each defendant individually:

> There are 7 counts in this case and as you know there are 17 defendants. But you should not think of the defendants as a group just because there are 17 of them. Because in this case it is your function to determine the guilt or the innocence of each defendant on each charge in this case.
>
> Now your verdict must be unanimous, you must determine the case solely from the evidence presented during the trial and state a separate verdict for each charge and defendant.
>
> Now we're going to simplify this for you and I'll show this to you later, but for each defendant we will have a verdict sheet with his name on it and it will outline the charges against him. And I'll show that to you later, that part will simplify it for you. And it will help remind you that each defendant is entitled to separate consideration, that's why there will be a separate sheet for each defendant, and you'll find that each charge will be set forth separately on the sheet, and there will be a yes/no or a guilty or not guilty answer on each sheet. And that again will remind you that each of them is entitled to separate consideration.

(Tr. 11/17/88 at 9).

> And as I have said many times, and I believe we have repeated it several times during the closings, the government has the burden of proving each defendant guilty beyond a reasonable doubt, and I believe I've told you before but I'll say it again.

(Tr. 11/17/88 at 11).

> You are instructed that evidence of flight may only be considered by you with regard to the individual defendant against whom it is offered, and it is not evidence against the other defendants.

> So if you find that there was flight with regard to Mr. Staino you may consider that with regard to him and him alone, and the same with Mr. Iannece.

(Tr. 11/17/88 at 18).

These instructions clearly indicated to the jury that they were to judge each defendant individually. In addition, the Court provided separate special verdict sheets to further ensure that the defendants were not prejudiced by a joint trial. The defendants have made no specific showing of prejudice.

■ We find no merit to defendant Pungitore's argument that the allegations of government witnesses involving Mr. Simone prejudiced him. Before the trial began, the government disclosed to the defense that evidence of Mr. Simone's alleged participation in criminal activities could be presented, and the government moved to disqualify Simone. Mr. LaCheen, counsel for Pungitore, argued against the government's motion to disqualify. LaCheen and other counsel were well aware of the risk in supporting Simone, but they chose to argue in favor of his continued participation in the trial. (Tr. 10/7/88 at 4–10). As the Government correctly suggests, after arguing successfully that Simone's advocacy was in the best interests of his client, LaCheen can not now succeed with the argument that his client was prejudiced by Simone's participation in the case. Therefore, defendant's motion for a new trial on based on grounds of improper joinder is denied.

■ Defendant Nicholas Virgilio also argues that the Court erred in failing to sever him and other defendants charged in only a "few" predicate acts of the indictment. Defendants argue that the prejudicial disparity of evidence entitles them to a new trial. Defendants' motion is both untimely and meritless.

No defendant other than Joseph Pungitore moved for a severance before or during the trial. The posttrial arguments of all other defendants rely on the incorrect assumption that Pungitore's motion was "filed on behalf of all defendants herein." (Brief at 1). The record clearly establishes

that the severance motion applied only to Pungitore. The results of a July, 1988 pretrial conference and an ensuing Court order prevent a defendant from joining in Pungitore's motion and require a defendant, if so inclined, to individually file a severance.

At a pretrial conference held on July 8, 1988, defense counsel moved to join in the motions filed by codefendants. The government did not object to the joining of pretrial motions, except for the severance motion of Joseph Pungitore. The government asserted that severance was an issue unique to each defendant, and defense counsel did not oppose this position. As a result of the conference, the Court entered an order stating in pertinent part as follows:

AND NOW, this 13th day of July, 1988, upon consideration of motions of several defendants for permission to join in motions made by their codefendants and upon oral representations made by counsel at a pretrial conference on July 7, 1988, it is ORDERED:

1. That each defendant shall be deemed to have joined in every applicable motion filed by a co-defendant, with the following exceptions:

A defendant may except himself from any such motion by filing a stipulation by July 21, 1988.

*No other defendant shall be deemed to have joined in the Motion for Severance included as Item No. VII in Joseph Pungitore's Omnibus Pretrial Motion filed June 30, 1988.* (emphasis supplied)

This order put each defendant on notice that if he wanted to pursue a severance argument, he could not rely upon the motion filed by Joseph Pungitore. Prior to the instant posttrial motion, no other counsel ever raised a severance issue at any point in the proceeding. Even if such a motion had been filed, we would have appropriately denied it for the same reasons set forth in our discussion of Joseph Pungitore's posttrial severance argument. Defendant's motion is denied.

*Admission of Recorded Conversation*

 Defendants argue that admission of a recorded conversation dated August 30, 1985 denied defendant Salvatore Wayne Grande of his right to a fair trial. (*See* G–1351 Book F, Tab 84). Defendants suggest that Grande was prejudiced because the recorded conversations related to a discussion of subpoenas and possible flight in connection with the Frank D'Alphonso (Frankie Flowers) murder. Thus, defendant argues, since the Flowers murder was not part of the indictment in this case, the prejudicial impact of this evidence outweighs any probative value because it permits the jury to infer that the defendant is a violent person with a propensity for flight. We disagree.

The Court balanced the probative value with the potential for unfair prejudice and concluded that the probative value outweighed the prejudice. (10/10/88 at 50). With regard to probative value, the Court found that admission of the tape was necessary to corroborate the testimony concerning the Mafia code of silence, *omerta*. Furthermore, testimony established that *omerta* played a critical role in the operation of the LCN and represented an important part of the government's case. (Tr. 10/10/88 at 42–50). With regard to potential prejudice, the Court found that any references to Grande invoking his Fifth Amendment rights, the murder investigation of Frankie Flowers, and flight were, without explanation, vague and meaningless. (Tr. 10/10/88 at 47); (Tr. 10/12/88 at 109). To mitigate the possibility of any prejudice, the Court prohibited the prosecution from eliciting any testimony that would explain any of those references, and prohibited them from arguing such points in the closing. (Tr. 10/12/88 at 109–11). The government followed the Court's instructions. Therefore, we find that there is nothing in the record that substantiates the claim that playing the tape of August 30, 1985 unfairly prejudiced Wayne Grande and deprived him of a fair trial.

*Expert Testimony*

 Defendants argue that the Court erred in allowing an expert witness to testi-

fy because he impermissibly based his opinion in facts not in evidence. During the trial, the government called as a witness FBI Special Agent Ray M. Stirling, a gambling examiner. Without objection, the government qualified Agent Stirling as an expert in the detection, identification, and interception of records, paraphernalia, and phone conversations associated with sports bookmaking and numbers gambling operations. Stirling testified about voluminous material he reviewed, including tapes resulting from wiretaps and evidence obtained from searches. In addition to his basing his opinion on intercepted conversations that the jury did hear, Stirling also based his opinion on tapes both the government and the defense [19] chose not to play before the jury.

F.R.Evid. 703 provides that if an expert relies on facts or data "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." While defendants concede that an expert may rely on certain inadmissible evidence, and that Agent Stirling relied on evidence reasonably relied upon in his field, they assert that an expert may not rely on non-admitted facts from the particular case in which he is testifying. Defendants reason that if we permit experts to rely on such evidence, an expert could render any opinion without placing any supporting facts into evidence. Defendants' position is meritless.

In *United States v. Theodoropoulos*, 866 F.2d 587 (3d Cir.1989), *reh. denied*, (Feb. 14, 1989), the Third Circuit addressed this issue and rejected defendants' position. The court held that it was not error for a an expert trained in cryptoanalysis to render an opinion based upon transcripts of telephone conversations from the case which were not placed in evidence. As long as the opinion is based on facts or data reasonably relied upon in the field, it is immaterial that the evidence was obtained in the particular case. Therefore, in the instant matter, it was not necessary that the Government offer into evidence all the tapes upon which Agent Stirling based his opinion. Defendants certainly had the opportunity to offer into evidence any of the other tapes and question the witness about his opinions. Defendants' motion is denied.

■ Defendants also argue that the Court erred in admitting the expert testimony of one Dr. Catherman because the factual basis of his opinion was not of the type reasonably relied upon in his field. Dr. Catherman testified with regard to racketeering act number 12 (Testa murder), and rendered his expert opinion on the cause and time of Testa's death.[20] Defen-

---

19. The Government made transcripts available to the defendants and permitted them to listen to and copy any tapes they deemed useful.

20. The relevant portions of Dr. Catherman's testimony with regard to date and time of death are as follows:

Q: And as a result of the examination you performed and other information that you received regarding when and where and how the body was discovered, were you able to arrive at an opinion as to the approximate time of death?
A: Yes.
Q: And what is that?
A: Based on the information received by me and my examination of the decedent at the time, my background, my training and experience in having examined other cases, it was my impression that the decedent had died about noon on the 14th day of September....
(Tr. 10/6/88 at 21).
Q: —if you will wait for the question, the question is you are also relying on your mem-

ory because it's not in the written report. You're relying on what people told you that is not in the written report, you're relying on something that you say now that's not in the written report, yes?
A: I had information that was given to me about this decedent.
Q: Okay.
A: I'm relying on that information because I—
Q: Right, now—
A: —was not physically present where the body was found.
Q: I got it, I got it.
A: Please let me answer your question.
MR. GORDON: Objection to the question. May the witness finish his answer?
THE COURT: Yes, I'll permit him to answer.
THE WITNESS: Therefore I had to rely on the descriptive findings based on the people who made those findings, where this body was first discovered between 10:00 and 10:30 on the evening of September the 14th. I did

dants argue that the witness impermissibly relied on the findings of Jeffrey Brown, a medical examiner, who provided Dr. Catherman with some descriptive information about the body.

We find that Dr. Catherman properly relied on facts of data of a type "reasonably relied upon by experts in the particular field." F.R.Evid. 703. Dr. Catherman based his opinion as to time and date of death on the following: the examination of the decedent performed eleven or twelve hours after the body was discovered; his background, training, and experience; descriptive findings of people present when the body was first discovered; and examination and findings at the scene of discovery by an experienced medical examiner's investigator who previously was a funeral director and a coroner. This is precisely the kind of data reasonably relied upon by experts in this field. As the Advisory Committee noted with regard to Rule 703, "[a] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors." Dr. Catherman's partial reliance on a description provided by Jeffrey Brown, an experienced medical examiner's investigator, is analogous to the physician's reliance on statements by patients and relatives, and reports and opinions from nurses and technicians. Therefore, defendants' motion is denied.

that. I also used my background, my training and my experience, I used my appearance (sic) of this body when I did the examination on the 15th beginning at 10:00 a.m. in order to reach that conclusion.
(Tr. 10/6/88 at 24–25).
Q: And you don't know the condition of the body when it was dropped either, do you?
A: I know the condition of the body when it was examined and described to me by my medical examiner's investigator.
(Tr. 10/6/88 at 29).
Q: I'm not proposing anything, Doctor. I'm saying that you're basing your opinion on what somebody else told you, correct?
A: I'm basing my opinion on what an observant made on the findings of this body, that observer or observant was the Medical Examiner's Investigator for Camden County.

*Variance in Indictment*

Defendants argue that the testimony of John Leone constitutes a fatal variance between proof and theory of the Government's shakedown case. The defendants argue that the indictment referred to specific types of extortions, while the evidence concerning John Leone alleged a different kind of extortion. Count one at Paragraph ten of the indictment alleges that the Philadelphia LCN generated income by "shaking down" (1) "persons involved in criminal activity who were not LCN members" and (2) "persons involved in legitimate purposes." According to the testimony, the LCN shook John Leone down for showing disrespect for defendant Scarfo. Defendants argue that this proof is at variance with the theory of the indictment, and thus the Court deprived them of their right to be tried only for the charges presented in the indictment. We disagree.

The government sufficiently charged the defendants of the extortion of John Leone in counts one and two of the indictment at racketeering act forty.[21] John Leone testified that Defendants Scafidi and Grande demanded $200 a week for his failure to shake Defendant Scarfo's hand at a wedding. When Leone said that he did not want to pay and that he wanted to see "Nicky", they answered, "[W]e're Nicky." Leone then paid the money for about three or four weeks until "everybody got locked up." (11/17/88 at 13–14). We find that this proof is within the indict-

(Tr. 10/6/88 at 30).

**21.** In pertinent part, the indictment provides as follows:

RACKETEERING ACT FORTY
(EXTORTION OF J.L.)

(40) From in or about September 1986, SALVATORE SCAFIDI and JOSEPH GRANDE, defendants herein, in the Eastern District of Pennsylvania, together with others to the grand jury known and unknown, did knowingly and intentionally obtain a total of over $600 from an individual with the initials J.L. by threatening to commit other criminal offenses, in violation of Title 18, Pennsylvania Consolidated Statutes Annotated, Section 3923.

ment's charging language. It certainly satisfies the general language of racketeering act forty, and it also fits into the second category of the manner and means section (count one at paragraph ten) because John Leone is involved in "legitimate purposes." Furthermore, even if the proof did not fit in the second category, that would be irrelevant to a variance argument. The manner and means portion of the indictment is inclusionary, not exclusionary: The prefatory language states that *"[a]mong* the manner and means whereby the defendants and co-conspirators conducted and participated in the conduct of the affairs of the enterprise...." (emphasis added). It is not uncommon for an indictment to charge only the essential elements of a conspiracy, without alleging the roles or theory of culpability of the defendant. Such an indictment has been held to be legally sufficient and does not preclude introduction of evidence that proves how the defendant participated in the conspiracy. In *United States v. Schoenhut,* 576 F.2d 1010, 1022 (3d Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed. 2d 421 (1978), the court held that one need not read an indictment literally, but that one should read an indictment with an appreciation for existing realities. An indictment is sufficient where the defendant is aware of the charges against him so that he is able to present his defense, avoid surprise, and protect himself against double jeopardy. *See also United States v. Johnstone,* 856 F.2d 539, 540–41 (3d Cir. 1988), *reh. denied,* (September 30, 1988). In the instant matter, the critical charging paragraph alleges all of the essential ele-

ments of the crime and the evidence is consistent with the violation as charged. Therefore, defendants motion is denied.

### *Quashing Subpoena*

■ Defendants argue that the Court erred in quashing defendants' F.R.Crim.P. 17(c) [22] subpoena to obtain the personal injury files of Michael Madgin from the offices of Attorney Frank Weisz, Madgin's civil counsel. During the trial, Michael Madgin testified concerning his activities as a Philadelphia LCN associate working under defendant Joseph Pungitore. On cross examination, Pungitore's counsel attacked Madgin's credibility, asking him about prior bad acts primarily involving phony insurance claims.[23] After Madgin left the stand, he contacted the prosecutors and informed them that although he had not been involved in any phony automobile insurance claims from 1978 through 1980, he did make two such claims in 1976 and 1986. The government immediately advised the Court and defense counsel of this revelation. Attorney LaCheen then subpoenaed all files concerning Madgin in Attorney Weisz's possession. Counsel argued that he needed the files to recall Madgin and question him about the alleged phony automobile claims. Counsel argued that he wanted to peruse all the files in with the expectation of discovering documents that would support his suspicion that there were more phony claims that Madgin had concealed. The government argued that LaCheen's efforts would amount to a fishing expedition designed to

**22.** In pertinent part, F.R.Crim.P. 17(c) provides as follows:

> A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.

**23.** During cross examination, the following exchange occurred between Madgin (M) and Attorney LaCheen (L), Pungitore's counsel:

> L: Now in addition to selling drugs back in '78 and '80 and around that time, did you do anything else that was not legitimate to raise money?
> M: Yes.

> L: Did you have—make some phony automobile accident claims to raise money?
> M: No.
> L: Did you have some phony burglaries—claims—insurance claims to raise some money?
> M: Never.
> L: Did you tell other people that you did?
> M: Never.
> L: Did you tell somebody that you made over $100,000 with phony insurance claims and that that was the money that you used to get into the drug business?
> M: Never.
> (Tr. 10/20/88 at 102).

dredge up support for collateral issues. The government supported the motion to quash and opposed any further cross examination of Madgin. However, the government agreed to submit a stipulation to the jury that would describe the two phony accident claims.

In its discretion, the Court precluded additional cross examination of Madgin on this issue but required that the Government read the stipulation to the jury. Under F.R.Evid. 608(b),

> [s]pecific instances of conduct of a witness for the purpose of attacking ... his credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of a witness (1) concerning his character for truthfulness....

The Court has a substantial degree discretion in controlling the extent of cross examination on collateral issues. *United States v. Palumbo*, 639 F.2d 123, 126 n. 3 (3d Cir.), *cert. denied*, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Mateos–Sanchez*, 864 F.2d 232, 235–36 (1st Cir. 1988); *United States v. Burchinal*, 657 F.2d 985, 994 (8th Cir.1981). The language of Rule 608(b) was phrased to "emphasize the discretionary power of the trial judge." *United States v. Fortes*, 619 F.2d 108, 118 (1st Cir.1980). Mr. LaCheen thoroughly questioned the witness concerning his prior bad acts, and the stipulation provided the jury with sufficient additional information concerning the phony automobile claims. Under such circumstances, the absence of further cross examination did not prejudice the defendants. A reasonable picture of the witness's credibility was established, and the Court was not required to "permit unending excursions into each and every matter touching upon veracity." *Fortes*, 619 F.2d at 118. It was appropriate for the Court to preclude the reopening of cross examination into an area already covered on cross examination and supplemented with a stipulation covering the phony automobile claims. Because of the misleading nature of the cross examination, and Madgin's volunteering the information, there was no indication that the witness lied about the automobile accident claims. The Court did not err in implicitly quashing the subpoenas through precluding cross examination because the documents would not have been admitted into evidence. *See United States v. Cuthbertson*, 651 F.2d 189 (3d Cir.) (inadmissible hearsay materials not retrievable under Rule 17(c) subpoena), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981). Therefore, defendants' motion is denied.

### Closing Remarks by Prosecution

Defendant Joseph Pungitore argues that he was denied a fair trial because the Government made inaccurate statements about the involvement of Pungitore in the June 8, 1982 shooting of Harry Riccobene. Specifically, Pungitore asserts that the government misrepresented to the jury the testimony of Philadelphia Police Officer Stan Panikowski by arguing that Panikowski had identified Pungitore and Grande as occupants of a car he observed in the vicinity of Harry Riccobene's house shortly before the shooting. Pungitore also argues that Panikowski gave descriptions of the car's occupants that did not match Pungitore, and that he actually identified Joseph Grande and Salvatore Grande as the only occupants of the car. The Court finds these arguments meritless.

With regard to the first contention, the government did not tell the jury that Panikowski identified Pungitore and Grande as the occupants in the car. Instead, government counsel correctly stated that Panikowski did not identify any of the car's occupants. Panikowski testified that on the evening of June 8, 1982, several hours before the shooting, he observed a white or beige colored automobile with license tag Pa. DUV–520 in the vicinity of Harry Riccobene's home. (Tr. 10/4/88 at 89–91). Panikowski testified that there were two white occupants in the car. (Tr. 10/4/88 at 90). He did not identify these occupants in direct examination and was not asked about them on cross examination. In fact, he was not asked any questions on cross. (Tr. 10/4/88 at 93). Other testimony and

evidence suggested that Grande and Pungitore were the shooters. (Tr. 10/5/88 at 27–30). The government accurately represented the testimony to the jury.[24] Furthermore, after the defense questioned the summation, the government repeated to the jury that Panikowski did not identify the occupants of the car and reminded them that their recollection of the evidence controls.[25] The government took no liberties with the record.

██ With regard to second contention, there is nothing in the record to indicate that Panikowski identified Joseph and Salvatore Grande as the occupants in the car. Attorney LaCheen chose not to cross examine Panikowski in this matter, and he can not now complain about a record that is the product of his own strategy. Attorney La-Cheen waited until after the close of the government's summation and the beginning of the defense summation to make a motion for a mistrial and in the alternative a motion to reopen the record. (Tr. 11/14/88 at 4–8). The Court has wide latitude in ruling on a motion to reopen the record, and it acted properly in denying the motions. *See United States v. Sandoval-Villalvazo*, 620 F.2d 744, 747–48 (9th Cir. 1980) (court did not abuse its discretion in refusing to open the record for testimony of defense witness who failed to appear within the court's deadline).

*Conspiracy Jury Instruction*

██ During the course of the Court's jury charge concerning RICO conspiracy, the Court carefully instructed the jury about a conspirator's liability for the actions and statements of other coconspirators including those made before he joined. In the course of this instruction, using language that had been approved expressly by the First Circuit in *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987), the Court compared a conspiracy to a train:

> Even if one joined the conspiracy after it was formed and was engaged in it to a degree more limited than that of the other co-conspirators, he is equally re-

---

**24.** In pertinent part, government counsel concluded as follows:

> It wasn't only DelGiorno's tes—testimony. It was also the testimony of Officer Pamkowski (PHONETIC), which will provide additional evidence with respect to this racketeering act and Grande's involvement in it as well as Pungitore. He was the individual who was in the neighborhood because this shooting took place near the neighborhood of where Harry Riccobene lived. He was in that neighborhood around 8:00 o'clock. This shooting took place later in the night.
>
> He was taking down license numbers because there were complaints of neighbors about vandalism and about kids in the neighborhood and around 8:30, there was a car in the neighborhood and he took the license number down. The neighborhood of Harry Riccobene. In fact, the car was right down the street from where Riccobene lived. Two men were in the car. The license number of the car came back to Rita Grande.
>
> Rita is Wayne Grande's husband [sic]. Wayne Grande is on the lease for the car. He signed the lease and that car was there and the people inside the car were Pungitore and Grande and they were there to stalk Harry and several hours later, they tried unsuccessfully to kill him.

(Tr. 11/11/88 at 105–06).

**25.** In pertinent part, the government counsel stated as follows:

> MR. PICHINI: Thank you, your Honor.

Before we begin Racketeering Act 8, which is the Pasquel (PHONETIC), Pat Spirito murder, I'm going to emphasize to you as it was emphasized by Government counsel in opening statements that none of the statements that I make during closing argument, none of them amount to evidence. The evidence comes from the witness stand and what I'm recounting to you is what the Government submits that evidence is.

And, if there's any difference between your recollection and my recollection, it's your recollection as to what the evidence is. And with respect to the Harry Riccobene attempts, the first attempts in June, the Government submits to you the testimony of DelGiorno, places Joe Pungitore and Wayne Grande in the car. That's the testimony. With respect to the Officer Pamkowski (sic), his testimony was he saw the car, he did not identify the occupants—occupants but he did identify the tag number and that tag number came back to a lease. The car was leased by Rita Grande. Her husband was Wayne Grande. So, we argue inferentially from the lease and directly from the testimony of DelGiorno that the individuals who were involved in that attempt in June on Harry Riccobene, Joseph Pungitore and Salvatore Wayne Grande. (Tr. 11/11/88 at 127–28).

sponsible as the originators of the conspiracy. It is not required that a person be a member of the conspiracy from its very start. He may join it at any point during its progress and be held responsible for all that has been done before he joined, and all that may be done thereafter during its existence and while he remains a member.

It is not necessary that the defendant be fully informed as to the details of the scope of the conspiracy in order to justify an inference of knowledge on his part. Knowing everything about every aspect of the conspiracy is not indispensable to a finding of knowledge of the illicit purposes and the nature of the operation of the conspiracy.

As one court put it a conspiracy is like a train, and where one party knowingly steps on board that train he's a part of the crew. Knowingly now. He becomes a part of the crew and assumes conspirators' responsibility for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.

When people enter into a conspiracy to accomplish an unlawful end they become the agents for one another in carrying out the conspiracy.

Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that the defendant was one of its members then the statements knowingly made and acts knowingly done by any other member may be considered by the jury against that defendant. This is so even though the acts or declarations were not made in his presence and were done without his knowledge as long as the statements were made or the acts were done during the course of the conspiracy, and in furtherance of some object or purpose of the conspiracy.

(Tr. 11/17/88 at 115–17). The Supreme Court and the Third Circuit have approved similar instructions. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948) (declarations and acts of various members done prior to adherence of defendant to conspiracy admissible); *United States v. Jannotti*, 729 F.2d 213, 221 (3d Cir.1984) (defendant need not be aware of all details of a conspiracy in order to have agreed to participate in it); *United States v. Gomberg*, 715 F.2d 843 (3d Cir.1983) (defendant need only be aware of conspiracy's general nature), *cert. denied*, 465 U.S. 1078, 104 S.Ct. 1439, 1440, 79 L.Ed.2d 760 (1984).

In an earlier portion of the charge, the Court had instructed the jury at length about the government's burden of proof as to each and every element of the crime. The Court specifically charged with respect to RICO conspiracy that the government had to prove beyond a reasonable doubt that the given defendant knowingly and willfully became a member of the conspiracy and that he knowingly and willfully agreed that he or another conspirator would commit at least two racketeering acts or one collection of an unlawful debt. (Tr. 11/17/88 at 108–12). These instructions were also correct. *See United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985); *Odesser v. Continental Bank*, 676 F.Supp. 1305, 1312 (E.D.Pa. 1987).

Following the Court's charge, Mr. Simone and Mr. LaCheen requested a sidebar. Mr. Simone asked that the Court instruct the jury that membership in the Mafia in and of itself is not an offense. The Court agreed to do this. (Tr. 11/17/88 at 135). Mr. LaCheen asked further:

The example you gave about the train, that you have to have it proven beyond a reasonable doubt that you know what's going on, you know where the train is going, you know what they're doing. That's the thing.

The Court agreed to accommodate this request as well. (Tr. 11/17/88 at 135–36). The Court then told the jury:

I want to stress one thing. I gave you the example of the train and that was quoted from the case called *United States v. Barnes* (sic). But I want to emphasize one word because I think it's important.

Proof of membership in the mafia in and of itself is not sufficient to convict, just standing by itself is not sufficient to convict. Now I told you conspiracy is like a train, and it is. But when a party knowingly steps aboard, it must be knowingly. You've got to know. Then he is part of the crew and assumes conspirators' responsibilities. And he assumes those responsibilities for the existing freight or conduct, regardless of whether he is aware of just what it is composed of.

(Tr. 11/17/88 at 136). This comment was followed by some final instructions concerning the mechanics of deliberation. The jury instructions concluded as follows:

COURT: That concludes my charge to the jury. Any further exception? From anyone?

MR. FRITCHEY: Government is satisfied with it, Your Honor.

MR. SIMONE: As are we.

COURT: Thank you very much, Mr. Simone.

(Tr. 11/17/88 at 138).

Despite acquiescing in Mr. Simone's assurance that the defense was satisfied with the charge as it stood, defendant Joseph Pungitore now asserts that what he was really doing was asking for a supplementary instruction that each element of the conspiracy must be proved beyond a reasonable doubt. As the record shows, counsel's inarticulately framed request was cast in the context of the train analogy, an analogy which, as he concedes in his brief, is pertinent not to the elements of the crime, but to the breadth of criminal responsibility that falls upon a conspiracy defendant. Given the number of times Mr. LaCheen referred to the requisite knowledge, the Court responded appropriately to his request by stressing the importance of "knowingly" stepping aboard the train. It would have been an incorrect statement of law to state that the government had to prove beyond a reasonable doubt that the defendant knew everything about every aspect of the conspiracy, and the Court did not so charge. Likewise, it would have been confusing and useless to discuss the elements of conspiracy in the context of the train analogy. The Court reasonably concluded that counsel was satisfied with its supplemental instruction as the defense did not object, and Mr. Simone announced the satisfaction of the defense team. The Court fairly and adequately covered the issues in question. *See United States v. Castro*, 776 F.2d 1118, 1128 (3d Cir.1985), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986); *United States v. Agnes*, 753 F.2d 293, 301 (3d Cir.1985). Defendant's motion is denied.

In conclusion, for the reasons adduced above, we deny all defendants' posttrial motions. The Court provided defendants with a fair and impartial trial, and the jury gave individual consideration to each defendant and charge.